No. 23-55258

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

JANE DOE,

*Plaintiff-Appellant*,

v.

COUNTY OF ORANGE, et al,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No.  8:20-cv-00322-JWH-GJS
Hon. JOHN W. HOLCOMB

---

## APPELLANT'S OPENING BRIEF

---

JANE DOE
11151 Valley Blvd #4886,
El Monte, CA 91734
*Plaintiff-Appellant in Pro Per*

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................5

JURISDICTIONAL STATEMENT .............................................5

RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS .....5

ISSUES PRESENTED ..................................................................5

STATEMENT OF THE CASE .....................................................6

    I.    Factual Background ......................................................6

    II.    Procedural Background.............................................17

STANDARD OF REVIEW ..........................................................18

ARGUMENT ................................................................................19

    I.    THE DISTRICT COURT IMPROPERLY WEIGHED
EVIDENCE, ASSESSED ITS CREDIBILITY, REQUIRED DOE TO
PROVIDE CORROBORATION, AND DREW INTERFERENCES
AGAINST DOE.............................................................................19

        A.    Doe's Deposition Testimony and Sworn Declaration In
This Case Are Consistent and Should Be Accepted As True .............19

        B.    Doe's Testimony and Declaration Are Sufficient to
Establish A Genuine Dispute of Fact ...................................................22

    II.    STANDARD APPLYING TO ACTS, OMISSIONS OR
CONDITIONS CONSTITUTING PUNISHMENT FOR PRETRIAL
DETAINEES ................................................................................29

    III.    EXCESSIVE GROUP STRIP SEARCHES, CONDUCTED IN
OPEN HALL WAY, REQUIRING FEMALE INMATES TO PULL DOWN
THEIR UNDERWEAR AND SHOW THEIR BLOODY FEMININE PADS

WERE COMPLETELY UNPROFESSIONAL, DEGRADING AND OFFENSIVE..................................................................................33

    A.    Cal. Penal Code §4030 Applies to Doe ..........................33

    B.    Excessive Group Strip Search Is Unnecessary Or Unjustified Response to Problems of WCJ's Security.......................35

IV.    MIDNIGHT CELL SEARCH ON AUGUST 11, 2019 VIOLATED DOE'S CONSTITUTIONAL RIGHTS UNDER FOURTH AND FIRST AMENDMENT........................................................................39

    A.    Harassing Midnight Cell Search Violated Fourth Amendment ........................................................................................40

    B.    Retaliatory Midnight Cell Search Violated First Amendment ........................................................................................43

V.    WCJ'S UNCONSTITUTIONAL PRACTICES, CUSTOMS OR POLICIES PRECLUDE THE AWARD OF SUMMARY JUDGMENT.. 53

VI.    WCJ'S ACTS, OMISSIONS OR CONDITIONS, VIEWED IN TOTALITY, ARE OBJECTIVELY UNREASONABLE AND CONSTITUTE PUNISHMENT TO DOE ....................................................61

VII.    DOE IS ENTITLED TO ALL WITNESS CONTACT INFORMATION AND THE DISTRICT COURT'S DENIAL IS A PLAIN ERROR    ..............................................................................70

CONCLUSION..........................................................................................72

STATEMENT OF RELATED CASES.........................................................73

CERTIFICATE OF COMPLIANCE ............................................................74

CERTIFICATE OF SERVICE....................................................................75

ADDENDUM

APPENDIX

## INTRODUCTION

Following release from pretrial detention, former detainee Jane Doe (Doe or Appellant), who was housed in Women's Central Jail (WCJ) operated by Orange County Sheriff's Department (OCSD), brought §1983 action, pro se and in forma pauperis, challenging conditions of confinement, excessive group strip search procedures, retaliatory midnight cell search, mandatory nude shower policy, hallway bra wearing policy, and naked release procedure, and alleging that the county provided her with inadequate hygienic supplies. The district court granted county officials' motion for summary judgment. Doe appealed because of the district court's plain errors.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. §§1331 and 1343(a)(3). This Court has jurisdiction under 28 U.S.C. §1291.

## RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS

An addendum setting forth verbatim the constitutional and statutory provisions pertinent to this case is attached to this brief, pursuant to Ninth Circuit Rule 28-2.7.

## ISSUES PRESENTED

1. Accepting Doe's assertions as true, viewing the evidence in the light most favorable to Doe, drawing all reasonable inferences in Doe's favor, and

applying objective inquiry set forth by *Kingsley*, did the District Court err legally and plainly in granting Defendants' summary judgment?

2. Was the district court's conclusion a plain error that Cal. Penal Code §4030 had no application to the searches alleged by Doe while §4030 does not permit strip searches simply because pretrial detainees are placed in the general jail population, and §4030 (l) mandates all strip, visual, and physical body cavity searches shall be conducted in an area of privacy so that the search cannot be observed by persons not participating in the search?

3. Was the district court's denial of discovery of out-of-custody witnesses contact information a plain error?

## STATEMENT OF THE CASE

### I.    Factual Background

Doe was a pretrial detainee at the County's WCJ from August 8, 2019 to August 12, 2019 after her arrest on misdemeanor charges, not related to weapon or contraband, while she was unarmed and defenseless. Doe was arraigned on August 12, 2019 and granted release from jail immediately after arraignment on her own recognizance. ECF 56 at 6. See also ECF 93-1 at 16.

Upon arriving at the jail at around 10:50 am Doe was wearing a T-shirt. Doe was denied food and blanket to keep warm despite the freezing environment and her repeated requests for food and blanket. ECF 56 at 6-8. Particularly, upon

notifying WCJ staff of her extreme discomfort – cold to death – due to the cold conditions, Doe was met with derision, laughter, and dismissive remarks, including the callous directive of "Don't come to jail next time." Moreover, her pleas were completely disregarded, receiving no remedial action or attention. *Id*. See also ECF 149-2 at 2-5. The condition was described by inmates as "freezing cold." ECF 149-2 at 11.

Despite no pervasive or serious problems with weapon or contraband inside WCJ (ECF 93-1 at 4-14, 36-99), and despite WCJ was equipped with body scanners (ECF 93-1 at 38), over the course of four-and-a-half-day incarceration Doe was strip searched for seven times in open hallway and in groups:

a. Before being housed in general population and after a mandatory shower in the presence and view of WCJ personnel on August 8, 2019.

b. Before going up to the patio on August 10, 2019.

c. Upon return from the patio on August 10, 2019.

d. Before leaving for court on August 12, 2019.

e. Upon arrival at court on August 12, 2019.

f. Upon return from court with approval of release on own recognizance on August 12, 2019.

g. Right before leaving WCJ on August 12, 2019.

The above strip searches were conducted in the presence and view of WCJ

staff and other inmates. ECF 56 at 8-15. Doe denied the strip searches were conducted in small groups because each group had approximately between 10 and 20 women while they stood shoulder to shoulder. ECF 139-6 at 7. See also ECF 56 at 10.

The jail's procedure for conducting the above searches of pretrial detainees entails a comprehensive inspection that involves the removal of each item of jail clothing, examination of the underwear, pulling down the underwear, lifting up the bloody menstrual pad, twisting the pad, shaking hair, long sleeves, pants, and socks. ECF 139-5 at 17-18, 23-26, 48-61. On one occasion, Doe was ordered to lower her underwear, bend over, open her vagina and rectum, and cough multiple times until the deputies were satisfied. ECF 56 at 10-11.

During the first strip search, Doe was forced to wear a bra in open hall way in the presence and view of WCJ staff and other inmates without being given access to a rest room. ECF 56 at 9-10. See also ECF 139-5 at 17. Also during that search, WCJ staff slapped Doe's head because Doe failed to shake her hair properly. ECF 139-5 at 18.

On two occasions during her time in WCJ, Doe was forced to be completely naked in front of WCJ staff and other inmates not for any reasonable security purpose, but for a mandatory shower and the retrieve of her own clothing before being released. ECF 56 at 9, 14; ECF 149-2 at 3-4.

Upon being placed in the general population, inmates receive a standard set of hygienic supplies (Welfare Pack), including soap, a toothbrush, toothpaste, and a comb, enough for only two days of use. Once the initial supply of these items is depleted, inmates are required to purchase replacements using their own funds. ECF 56 at 13; ECF 149-2 at 3. Doe was never informed that she could request indigent pack if she had insufficient fund. *Id*. Inmates who requested indigent pack never received one. ECF 149-2 at 12.

Shampoo was not included in hygienic supplies and inmates must purchase from WCJ regardless of their financial status. ECF 93-1 at 103, 105, 107 and 109. Due to the lack of provision of shampoo Doe was unable to wash her hair even if she wanted to do so in the sink.

Defendants had full knowledge of extreme noise caused by the flushing of industrial-style toilets, as evidenced by the prohibition from flushing toilets when deputies were present. ECF 56 at 12; ECF 139-5 at 76. Throughout both day and night, the light positioned over Doe's bed was consistently left turned on without any interruption, indicating that it was not a low-wattage light. ECF 149-2 at 6. Defendants did not provide the photo of the light or at least the brand and model number of the light.

No evidence suggests that the light over Doe's bed was dimmed at night. Doe's sleep pattern was disrupted due to the continuous noise from loud toilet

flushing and the presence of 24-hour lighting directly over her bed. The constant

noise and the persistent illumination hindered Doe's ability to attain proper rest and

disturbed her sleep cycle. *Id.*

Facility Assigned Search Team (FAST) search is the process of picking a

random area (tank, series of cells, etc.) to search. ECF 139-6 at 107. During the

entire discoverable period that represents the jail's policy and practice, ECF 93-1 at

4-14, 36-99, there was only one midnight cell search.

| Date | Time | Searched Location | Reference |
|------|------|-------------------|-----------|
| 7/8/2019 | 09:34 a.m. | Kitchen | ECF 93-1 at 36 |
| 7/8/2019 | 20:42 p.m. | Module P Tank 13 | ECF 93-1 at 37 |
| 7/9/2019 | 10:50 a.m. | Dis-Iso Cell #1 | ECF 93-1 at 38 |
| 7/9/2019 | 21:20 p.m. | Classroom | ECF 93-1 at 39 |
| 7/10/2019 | 11:30 a.m. | Module I Tank 9 Cell 4 and Tank 10 Cell 4 | ECF 93-1 at 40-41 |
| 7/10/2019 | 20:10 p.m. | Module G and H, Tanks 3-6 dayrooms | ECF 93-1 at 41 |
| 7/11/2019 | 11:04 a.m. | Module I tank 11-4 and 12-3 | ECF 93-1 at 43 |
| 7/11/2019 | 20:16 p.m. | Classroom | ECF 93-1 at 43 |
| 7/12/2019 | 11:24 a.m. | P-14 all bunks | ECF 93-1 at 45 |
| 7/12/2019 | 18:59 p.m. | FOU #14 | ECF 93-1 at 46 |
| 7/13/2019 | 14:43 p.m. | FOU #7 | ECF 93-1 at 47 |
| 7/13/2019 | 21:06 p.m. | Module H Tank 8 | ECF 93-1 at 48 |
| 7/14/2019 | 08:42 a.m. | Sheltered Living Cell #1 | ECF 93-1 at 49 |
| 7/14/2019 | 20:25 p.m. | Module H Tank 5 | ECF 93-1 at 50 |
| 7/15/2019 | 14:33 p.m. | Sewing Room | ECF 93-1 at 52 |
| 7/15/2019 | 21:28 p.m. | FOU dayroom | ECF 93-1 at 52 |
| 7/16/2019 | 08:50 a.m. | FOU #14 | ECF 93-1 at 53 |
| 7/16/2019 | 20:50 p.m. | Module G/H tanks 1/2 and 7/8 dayrooms | ECF 93-1 at 54 |
| 7/17/2019 | 15:10 p.m. | FOU cell #5 | ECF 93-1 at 55 |
| 7/17/2019 | 20:37 p.m. | Module I Tank 10 bunk 1 | ECF 93-1 at 56 |
| 7/18/2019 | 11:22 a.m. | Module H Tank 6 dayroom | ECF 93-1 at 57 |

| 7/19/2019 | 03:18 a.m. | Roof | ECF 93-1 at 59 |
|-----------|-----------|------|----------------|
| 7/19/2019 | 15:00 p.m. | A/B visiting | ECF 93-1 at 59-60 |
| 7/19/2019 | 19:56 p.m. | FOU #3 | ECF 93-1 at 60 |
| 7/20/2019 | 08:49 a.m. | Roof | ECF 93-1 at 61 |
| 7/20/2019 | 20:40 p.m. | Module H tanks 7/8 | ECF 93-1 at 62 |
| 7/21/2019 | 15:10 p.m. | Sheltered living cell #1 | ECF 93-1 at 63 |
| 7/21/2019 | 20:44 p.m. | Module H tank 6 | ECF 93-1 at 64 |
| 7/22/2019 | 10:05 a.m. | Tank 3 | ECF 93-1 at 65 |
| 7/22/2019 | 22:47 p.m. | Attorney bonds and visiting | ECF 93-1 at 66 |
| 7/23/2019 | 08:25 a.m. | Tank 7 bunk 20 | ECF 93-1 at 67 |
| 7/23/2019 | 20:24 p.m. | Module G and H tanks 3/4 and 5/6 dayrooms | ECF 93-1 at 68 |
| 7/24/2019 | 14:28 p.m. | FOU #12 | ECF 93-1 at 70 |
| 7/24/2019 | 20:39 p.m. | Module G tank 1 | ECF 93-1 at 70 |
| 7/25/2019 | 12:50 p.m. | Sewing room | ECF 93-1 at 71 |
| 7/25/2019 | 21:09 p.m. | Module I tank 10 cell 1 | ECF 93-1 at 72 |
| 7/26/2019 | 19:56 p.m. | SLC #2 | ECF 93-1 at 74 |
| 7/27/2019 | 14:10 p.m. | Roof | ECF 93-1 at 75 |
| 7/27/2019 | 19:48 p.m. | Kitchen | ECF 93-1 at 76 |
| 7/28/2019 | 12:19 p.m. | Sheltered living cell #2 | ECF 93-1 at 77 |
| 7/29/2019 | 09:51 a.m. | Module I tank 9 cells 1-4 | ECF 93-1 at 79 |
| 7/29/2019 | 20:09 p.m. | Sheltered living cell #1 | ECF 93-1 at 80 |
| 7/30/2019 | 14:37 p.m. | SLC #2 | ECF 93-1 at 82 |
| 7/30/2019 | 20:45 p.m. | Kitchen | ECF 93-1 at 82 |
| 7/31/2019 | 14:00 p.m. | SLC #1 | ECF 93-1 at 83 |
| 7/31/2019 | 19:42 p.m. | Module H tank 8 bunks 1-40 | ECF 93-1 at 84 |
| 8/1/2019 | 10:20 a.m. | Tank 3 | ECF 93-1 at 85 |
| 8/1/2019 | 20:16 p.m. | Module I tank 9 cell 4 and tank 12 cell 2 | ECF 93-1 at 86 |
| 8/2/2019 | 10:04 a.m. | Female observation unit cell #9 | ECF 93-1 at 87 |
| 8/2/2019 | 20:22 p.m. | Module H tank 6 | ECF 93-1 at 88 |
| 8/3/2019 | 11:40 a.m. | Module G tank 2 bunks 1-40 | ECF 93-1 at 89 |
| 8/3/2019 | 21:23 p.m. | Second floor classroom | ECF 93-1 at 90 |
| 8/4/2019 | 14:34 p.m. | FOU dayroom | ECF 93-1 at 91-92 |
| 8/4/2019 | 20:56 p.m. | Roof | ECF 93-1 at 92 |
| 8/5/2019 | 08:42 a.m. | Module G tank 1 | ECF 93-1 at 93 |

| 8/5/2019 | 20:40 p.m. | Sheltered living cell #2 | ECF 93-1 at 94 |
|---|---|---|---|
| 8/6/2019 | 15:35 p.m. | Roof | ECF 93-1 at 96 |
| 8/6/2019 | 22:09 p.m. | Module I dayrooms 9, 10, 11, 12 | ECF 93-1 at 97 |
| 8/7/2019 | 15:24 p.m. | Module P FOU #15 | ECF 93-1 at 98 |
| 8/7/2019 | 20:12 p.m. | Sheltered living cell #2 | ECF 93-1 at 99 |
| 8/8/2019 | 12:06 p.m. | FOU #13 | ECF 93-1 at 4 |
| 8/8/2019 | 20:14 p.m. | Kitchen | ECF 93-1 at 5 |
| 8/9/2019 | 14:24 p.m. | Module H Tank 5 bunk 8 | ECF 93-1 at 6 |
| 8/9/2019 | 20:26 p.m. | P-13 | ECF 93-1 at 7 |
| 8/10/2019 | None | None | ECF 93-1 at 8-9 |
| 8/11/2019 | 00:16 a.m. | Module G Tanks 1 and 2, bunks 1-40 | ECF 93-1 at 10 |
| 8/11/2019 | 13:28 p.m. | SLC #1 | ECF 93-1 at 11 |
| 8/11/2019 | 20:34 p.m. | Module G Tank 3 including dayroom | ECF 93-1 at 11 |
| 8/12/2019 | 08:17 a.m. | Module G Tank 8 | ECF 93-1 at 13 |
| 8/12/2019 | 20:50 p.m. | P-13 | ECF 93-1 at 14 |

At approximately 12:16 a.m. on August 11, 2019 WCJ staff conducted an unannounced shakedown in Doe's cell. All inmates were cleared of the sleeping area. Each bed was searched and inmates were not permitted to watch the search. ECF 56 at 13-14; ECF 93-1 at 10. During the shakedown one deputy loudly announced to all 40 inmates that such searches would continue regularly unless and until all inmates would keep quiet during the day. The deputy went on and declared in a degrading manner that dayroom and phone service would be shut down unless and until all inmates would shut up during the day. ECF 149-2 at 4.

During the entire discoverable period, nothing was ever found during group strip searches. Only ten occasions where altered razors were found as follows:

On 7/10/2019, FAST search was conducted in Module I Tank 9 Cell 4 and Tank 10 Cell 4. Trash and altered razor was found and disposed of properly in the security trash. Sgt. A. Sandler #1800 was present. JI#WJ071019/1130. ECF 93-1 at 40-41. No major jail rule violation was written up.

On 7/10/2019, FAST search conducted in Module G and H, Tanks 3-6 Dayrooms by Deputies (Redacted inmates' names). Trash, altered flip flops, extra jail issue, altered razor and a medical pitcher was found. Sgt. White #5119 was present. Report by Redacted. JI: WJ07-10-19/2010. ECF 93-1 at 41. No major jail rule violation was written up.

On 8/1/2019, FAST search was conducted in Tank 3. Chow hall food, an altered razor and ripped sheets were found. Report written by CSA Lopez #9460. JI:WJ080119/1020. ECF 93-1 at 85. No major jail rule violation was written up.

On 8/1/2019, Redacted will be written up on a Major Jail Rule violation for possession of contraband and an altered razor. Report written by Deputy Addington #10682. Sgt. Mclain was notified. JI:WJ/080119/1021.0017. ECF 93-1 at 85.

On 8/2/2019, Redacted was written up on a Major jail rule violation for an altered razor found under her mattress during the FAST Search. Report written by Deputy Falconer #10050. JI: WJ08-02-19/2030. ECF 93-1 at 88.

On 8/3/2019, Chow hall food, altered razor, pillow belonging to another I/M

13

and trash was found. Sgt. Hodges #7230 present. Report by CSA Linich #9914. JI: WJ08-03-19/1140. ECF 93-1 at 89. No major jail rule violation was written up.

On 8/11/2019, Redacted will be written up on a Major Jail Rule violation for an altered razor found during the FAST search. Report written by Deputy Addington JI:WJ081119/0117. ECF 93-1 at 10.

On 8/11/2019, Redacted will be written up on a Major Jail Rule violation for an altered razor found during the FAST search. Report written by Deputy Addington. JI:WJ081119/0118. ECF 93-1 at 10.

On 8/11/2019, Redacted will be written up on a Major Jail Rule violation for an altered razor found during the FAST search. Report written by Deputy Addington. JI:WJ081119/0119. ECF 93-1 at 10.

On 8/12/2019, Chow hall food, altered razors and altered pads were found and disposed of in security trash, Sgt. L. Cantrell #7814 was present Report by Redacted. JI: WJ0S-12-19/0817. ECF 93-1 at 13. No major jail rule violation was written up.

Out of ten, only five occasions were written up major jail rule violations. Three of the five occasions occurred during the retaliatory midnight cell search. The extra two entries indicating that altered razors were found and the inmates were written up violation do not erase the fact that there were five occasions no violation was written up when altered razors were found. Instead, whether to write

up violations is apparent to be used as arbitrary punishment.

WCJ's policy provides that each inmate will be offered an opportunity to have a minimum of three (3) hours of outdoor recreation each week. ECF 139-6 at 99. In practice, however, Doe was provided only about 45 minutes per week outdoor recreation. ECF 56 at 12.

In Doe's cell, a 1000-square-foot area with no window, there are 20 bunk beds. ECF 93-1 at 32. Some of them are only one foot apart. An indoor 350-square-foot dayroom is behind four toilets. ECF 93-1 at 34. The 350-square-foot dayroom is unable to provide any meaningful recreation for 40 women. Over the course of four-and-a-half-day incarceration Doe was locked up 24 hours in her cell except a onetime outdoor recreation on the patio located within WCJ without outside contact.

Board of State and Community Corrections (BSCC) issued a letter to Sheriff on September 26, 2018 regarding 2016-2018 biennial inspection. ECF 149-2 at 175. In that letter, it states that crowding was evident in all facilities. ECF 149-2 at 177. WCJ had a rated capacity of 274 inmates but on the day of the inspection, it housed 336 inmates, representing 23% (274x123%=336) over capacity. The dormitories have insufficient square footage resulting in noncompliance. *Id*. See *Shorter v. Baca*, 895 F.3d 1176, 1185 (2018) (noting that a letter from both the Chief of the Special Litigation Section of the Civil Rights Division of the DOJ and

the U.S. Attorney for the Central District of California was compelling evidence.)

Despite receiving information from BSCC regarding the issue of overcapacity, the defendants deliberately chose to disregard the problem, allowing it to persist even until Doe's incarceration. This indicates that the defendants made intentional decisions concerning the overcrowding situation. WCJ's deliberate choice is also evident by BSCC's monitor. Before Covid-19, starting as early as October 2015 OCSD had been constantly maintained over its estimated rated capacity. ECF 93-1 at 101.

The Sheriff (Don Barnes) is the final authority in all matters of Departmental policy, operations, and discipline. ECF 149-2 at 185-187. The Sheriff is charged with the maintenance and operation of the county jail system and the custody of all prisoners confined therein. *Id*. Assistant Sheriff (William Baker) is responsible for the fulfillment of all Department objectives and for the enforcement of all policies, orders, rules and regulations of the Sheriff-Coroner. *Id*. Baker is responsible for the planning, directing, coordinating and controlling of all activities of the custody operations of the Department and shall formulate rules and procedures necessary to carry out the policies and directives of the Sheriff-Coroner. Commander (Joe Balicki) is responsible for ensuring that commands under his control are meeting Department and command standards of custody operations. A Captain is subordinate to a Commander. Captain Mark Stichter plans, organizes, controls and

directs the work of WCJ. *Id*. The County admitted that pretrial detainees could be punished. ECF 149-2 at 203-204.

## II.    Procedural Background

In February 2020, Doe, representing herself *pro se*, filed the instant action. ECF 1. The District Court granted Defendants' motion to dismiss with leave to amend. ECFs 42, 51. Doe then filed the amended complaint at issue here, asserting seventeen causes of action. ECF 56.

Doe moved to compel contact information and bed numbers of each and all inmates who were held in the same holding tank with Doe between Aug 8 and Aug 12, 2019. ECF 61 at 8. The district court granted to the extent to the individuals who remained in custody. Doe was unable to obtain from defendants any contact information of the individuals who are no longer incarcerated related to the time frame at issue. ECF 71. Doe sought documents reflecting the weapon and contraband or drugs confiscated through searches of inmates, including but not limited to body search and cell search, in WCJ between Jan 1, 2015 and Dec 31, 2019. The district court narrowed the discoverable 24 hour jail logs to only one month prior to Doe's arrest. ECF 73.

The defendants moved for summary judgment to which Doe opposed. ECFs 139, 144, 147, 149, 153. The magistrate recommended to grant the motion and concluded that Doe was not at substantial risk of suffering serious harm and none

of Doe's allegations rose to the level of punishment or violated her constitutional rights. ECF 163. Doe objected to the magistrate's recommendation. ECF 168.

In support of their motion for summary judgment, Defendants presented no evidence of serious violence and contraband problems in WCJ. No evidence of inmate-on-inmate violence using weapon, no evidence of violent attacks against correctional officers using weapon, no evidence of contraband found during group strip searches. Defendants offered no specific reasons for WCJ's strip search policy or its practice of forcing inmates to expose their naked body. Nor did Defendants explain why WCJ could not make the strip search determination on an individualized basis, or could not search Doe's cell before or after sleeping hours, or why WCJ believed that strip searches were necessary at all times to protect inmates and officers safety. Defendants presented no evidence of adequate training.

A final judgment was entered on February 16, 2023. ECF 171. Doe timely appealed. ECF 173.

## STANDARD OF REVIEW

This Court reviews de novo a grant of summary judgment. See *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). This Court must determine, viewing the evidence in the light most favorable to Doe (the non-moving party), whether any genuine issue of material fact exists and whether the district court correctly applied

the relevant substantive law. *Id*.

## ARGUMENT

## I. THE DISTRICT COURT IMPROPERLY WEIGHED EVIDENCE, ASSESSED ITS CREDIBILITY, REQUIRED DOE TO PROVIDE CORROBORATION, DREW INTERFERENCES AGAINST DOE, AND SHIFTED BURDEN TO DOE

The district court did not construe the evidence in the light most favorable to Doe, nor did it draw all reasonable inferences in her favor. The district court characterizes all Doe's testimony and declaration as self-serving and uncorroborated but credits defendants' self-serving and uncorroborated declarations as competent evidence. ECF 163 at 15, 29, 30, 69, 75.

### A. Doe's Deposition Testimony and Sworn Declaration In This Case Are Consistent and Should Be Accepted As True

The magistrate judge prohibits Doe from disclosing the identity of other inmates, ECF 102, as such Doe can identify only the initials of other inmates as witnesses. ECF 149-2 at 1. However, the district court improperly concluded that Doe did not identify any person who could testify. ECF 163 at 29, n. 21. The district court also rejected Doe's account of events because Doe had not provided any declaration from any other inmate. *Id*. However, one party's assertions can be enough to defeat a summary judgment motion. *Robins v. Centinela State Prison*, 19 F. App'x 549, 550 (9th Cir. 2001) (holding that once Robins' version of the search - a correction officer inappropriately groped him while conducting a clothed

body search - is accepted as true, he has a legitimate claim that the search was unreasonable and violated his Fourth Amendment rights.) No additional evidence is required. See *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir.1999); *Foster v. Arcata Assoc*., 772 F.2d 1453, 1461 (9th Cir.1985).

The district court rejected Doe's account of pulse drop due to cold temperature, explaining that the only evidentiary support she proffers is her own assertion that her normal pulse is 90 and a document filed under seal that lists the "vital signs" for someone (name redacted) taken at 4:06 p.m. on August 8, 2019, which included a pulse of 57. The district court manufactured arguments for defendants and has concluded that Doe's uncorroborated assertion as to her "normal" pulse and this document are insufficient to establish that she (1) actually suffered the asserted pulse drop due, and, more importantly, (2) that it actually was due to an unduly cold temperature as opposed to physical inactivity. ECF 163 at 29 n. 21. However, the district court's disbelief of Doe's assertions in her deposition and sworn declaration cannot support summary judgment. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). See also *Eisenberg v. Insurance Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987) ("[W]e find that the district court's grant of summary judgment was unwarranted. . . . [The non-movant's] declaration is to be accepted as true. . . . [The non-movant's] evidence should not be weighed against the evidence of the [movant]."); *Foster*, 772 F.2d at 1460-61 ("In her

deposition and subsequent declaration in opposition to Arcata's motion for summary judgment, Foster states facts which, if true, could justify an inference that she was qualified for Hamby's position. . . . Such factual issues may not be resolved in favor of the moving party on summary judgment when, as here, the adverse party has supported its position by evidentiary materials as provided in Rule 56. It is enough that these materials consist of the party's own sworn deposition testimony and declaration in opposition to the motion for summary judgment.")

Further, no evidence in the record supports that Doe's significant drop in pulse rate was actually due to physical inactivity or physical inactivity could make pulse dropped from 90 to 57, a nearly 60% drop. As FAC states, Doe asked for blanket or clothing to keep warm only after a brief interview upon arrival at WCJ. ECF 56 ¶24-26. Other inmates had also complained about the temperature and described the temperature in the jail as "freezing cold." ECF 149-2 at 11.

Defendants' evidence indicates that the temperature on the First Floor of the Jail – both on the day on which Doe was booked and on a later day after she returned from court – was an average of 70 degrees. Weighing Defendants' evidence against Doe, the district court has improperly concluded that this is not a bone chillingly cold temperature; Doe's "uncorroborated and selfserving"

Case: 23-55258, 06/21/2023, ID: 12741506, DktEntry: 5, Page 22 of 81

statement otherwise is insufficient to create a genuine issue of disputed fact. ECF
163 at 30.

The district court has improperly concluded that Doe's allegations in her
complaint are vague at best and are unverified, and thus, are not evidence. ECF
163 at 59 n. 28. However, this court has previously rejected the notion that a
plaintiff cannot rely solely on the allegations in his pleadings but must, by affidavit
or otherwise, set forth specific facts showing that there is a genuine issue for trial.
*Robins*, *supra,* at 550 (holding that one party's assertions can be enough to defeat a
summary judgment motion.)

At the summary judgment stage the court may not weigh the moving party's
evidence against the nonmoving party's evidence. *Lowry v. City of San Diego*, 858
F.3d 1248, 1263 (9th Cir. 2017). Rather, "the judge must assume the truth of the
evidence set forth by the nonmoving party." *Leslie v. Grupo ICA*, 198 F.3d 1152,
1158 (9th Cir. 1999) (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors
Ass'n*, 809 F.2d 626 (9th Cir. 1987) ). However, Doe's assertions, testimony and
sworn declaration were not assumed as true.

## B. Doe's Testimony and Declaration Are Sufficient to Establish A Genuine Dispute of Fact

"Uncorroborated and self-serving" testimony may be sufficient to establish a
genuine dispute of fact where it is "based on personal knowledge, legally relevant,

and internally consistent. *Lowry*, *supra,* at 1262 (quoting *Nigro v. Sears, Roebuck & Co*., 784 F.3d 495 (9th Cir. 2015).) Although the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature. *Lowry*, *supra,* at 1262. See also *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (concluding that Keenan, through a verified complaint treated as an affidavit, produced sufficient evidence to make his noise claim a disputed issue of material fact not subject to summary judgment despite the defendants produced contrary evidence, see Affidavit of Theodore S. Long of Nov. 3, 1993, at 3 (denying knowledge of the banging, and claiming to have moved inmates who became "major noise problem[s]" to muffled cells).)

The district court considered Lowry's testimony, that the door to Suite 201 was shut when the officers arrived because it had automatically closed behind her after she came back in from the bathroom, to be speculation rather than first-hand testimony and determined that the testimony was insufficient to create a dispute of fact. This Court concluded that Lowry's testimony was based on her first-hand knowledge of the door in question and her personal recollection that she did not prop it open on the night in question and also specific, "legally relevant, and internally consistent." *Lowry, supra,* at, 1263.

To establish that he was terminated by Sears because of his disability, Nigro submitted a declaration stating that on June 29, 2009, he had a phone conversation with Larry Foerster, General Manager of the Sears Carlsbad store at which Nigro worked, and Foerster told him that "[i]f you're going to stick with being sick, it's not helping your situation. It is what it is. You're not getting paid, and you're not going to be accommodated." Nigro also testified in his deposition that Sears's District Facilities Manager Alan Kamisugu told him not to be concerned about his pay issue because Chris Adams, Sears's District General Manager, had indicated to Kamisugu that Nigro was "not going to be here anymore." The district court disregarded the evidence proffered by Nigro, on the basis that "the source of this evidence is Nigro's own self-serving testimony."

This Court concluded that the district court erred in disregarding Nigro's testimony in granting Sears's motion for summary judgment. Nigro's declaration and deposition testimony, albeit uncorroborated and self-serving, were sufficient to establish a genuine dispute of material fact on Sears's discriminatory animus. He related statements made to him both in person and over the telephone. His testimony was based on personal knowledge, legally relevant, and internally consistent. *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 498 (9th Cir. 2015).

Phan's and Yang's declarations, attesting to a restructuring of the transaction that created a bona fide obligation for Wu fully to repay Hartcourt for the stock,

were viewed as "uncorroborated and self-serving" and as contradicted by earlier testimony in the record by the district court, and so disregarded regarding restructuring. This Court concluded that the district court's characterizations of the statements cannot justify disregarding them. *S.E.C. v. PHAN*, 500 F.3d 895, 909 (9th Cir. 2007).

In most cases, "[t]hat an affidavit is selfserving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact." *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999). Only in certain instances — such as when a declaration "state[s] only conclusions, and not 'such facts as would be admissible in evidence,'" — can a court disregard a selfserving declaration for purposes of summary judgment. Id. (quoting FED. R. CIV. P. 56(e)).

*Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054 (9th Cir. 2002), relied upon by the district court (ECF 163 at 29-30) as supporting the disregard of Doe's "uncorroborated and self-serving" declaration, involved just such a situation: The declaration in question included facts beyond the declarant's personal knowledge and "provide[d] no indication how she knows[these facts] to be true." Id. at 1059 n. 5, 1061. Here, Doe's declaration does not have a similar defect, as it involves the declarant's own direct personal knowledge. Doe's "uncorroborated" declaration

does not disqualify her from testifying about the events — subject, of course, to a credibility determination by the finder of fact.

The requirement that Doe's testimony shall be corroborated necessarily implies that Doe is lying. However, "[a] district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented." *Schlup v. Delo*, 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quoting *Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ). As the Supreme Court has further observed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ). Thus, it was error for the district court to assess Doe's credibility and impose requirement of corroboration of her testimony.

Further, the sufficiency of the corroboration is, of course, a question for the jury. *United States v. Seavey*, 3 Cir., 180 F.2d 837, 840. In speaking of the question of the trustworthiness of the corroborative testimony, the Supreme Court said in *Weiler v. United States*, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed 495, "To resolve this latter question is to determine the credibility of the corroborative testimony, a function which belongs exclusively to the jury." See also *Buckner v. United States*,

81 U.S.App.D.C. 38, 154 F.2d 317, 318, and *Adams v. United States*, 9 Cir., 191 F.2d 206.

It is remarkable to note that Defendants cannot corroborate their declarations. ECF 163 at 13, 29. Nor can they refute Doe's declaration. Based on O'Connell's description of his job duties, a deputy who did not establish where he was on August 8, 2018, the district court took credit of his declaration over Doe's concerning the jail temperature. See *Tolan v. Cotton*, 572 U.S. 650, 658-659 (2014) (finding error where the court credited the evidence of the party seeking summary judgment and failed properly to acknowledge key evidence offered by the party opposing that motion.)

Here, if Doe's deposition testimony and sworn declaration are believed, her claims may not be dismissed on summary judgment.

## C. The District Court Erred In Shifting The Burden To Doe

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby. Inc*., 477 U.S. 242, 256 (1986). Defendants bear the initial burden to show group strip searches, midnight cell search, and conditions of confinement advanced legitimate security goal; and their training were adequate. Despite Defendants have not met their initial burden, the district court erred in shifting the burden to Doe and concluding that Doe has not shown that the searches were conducted in the absence of possible

opportunities to obtain contraband or a weapon, ECF 163 at 38, that the midnight search in question did not advance the legitimate security goal, ECF 163 at 64, that the training received was inadequate, ECF 163 at 75.

Despite no evidence in the record suggests that Defendants have received training orally at any training sessions, the district court manufactured arguments for defendants and concluded that Defendants may have received training orally outside the training record. ECF 163 at 75. However, even if there were oral trainings, oral trainings may lack depth, clarity, and comprehensive coverage of the legal principles involved. Moreover, the reliance solely on oral trainings may increase the risk of miscommunication or misunderstanding of the complex legal standards governing inmates' rights. To meet their duty of adequate training, correctional facilities should provide comprehensive and ongoing training programs that address inmates' constitutional rights, including written materials, interactive sessions, case studies, and practical exercises. This multifaceted approach ensures that correction officers are well-equipped to recognize and respect inmates' constitutional rights. A reasonable jury could conclude oral training, leaving no record of the extent and the length of the training, constituted a failure to train or insufficient training amounted to deliberate indifference given the constant complaints about widespread violations of inmates' constitutional rights. ECF 149-2 at 9-15.

## II.   STANDARD APPLYING TO ACTS, OMISSIONS OR CONDITIONS CONSTITUTING PUNISHMENT FOR PRETRIAL DETAINEES

The Fourteenth Amendment's Due Process Clause prohibits holding pretrial detainees in conditions that amount to punishment. See *Gary H. v. Hegstrom*, 831 F.2d 1430, 1432 (9th Cir. 1987) ("[T]he more protective fourteenth amendment standard applies to conditions of confinement when detainees ... have not been convicted [of a crime.]")

While a convicted prisoner is entitled to protection only against "cruel and unusual" punishment [under the Eighth Amendment], a pretrial detainee, not yet found guilty of any crime, may not be subjected to punishment of any description. *Banks v. Booth*, 468 F. Supp. 3d 101, 110 (D.D.C. 2020). There is no need here, as there might be in an Eighth Amendment case, to determine when punishment is unconstitutional. *Kingsley v. Hendrickson*, 576 U.S. 389, 401 (2015).

A pretrial condition can amount to punishment in two ways: first, if it is "imposed for the purpose of punishment," or second, if the condition "is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment." *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979) *Id*. at 538–39. The Supreme Court explained that "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate

governmental objective or that it is excessive in relation to that purpose." *Kingsley*, *supra,* at 396-340.

Even if the jail's policy might ultimately be found to be rationally related to a legitimate governmental objective, the deprivation it imposes must not be excessive in relation to that purpose. *Kingsley*, 576 U.S. at 396-340. This assessment calls for considering not just the government's interest but also the dignity interests of the plaintiffs. See *Brown v. Plata*, 563 U.S. 493, 510 (2011) (although prisoners are deprived of many rights while in custody, "the law and the Constitution demand recognition of certain other rights. Prisoners retain the essence of human dignity inherent in all persons.")

After *Kingsley*, it is plain that punishment has no place in defining the *mens rea* element of a pretrial detainee's claim under the Due Process Clause. Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm. *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

The detainee is involuntarily confined and deprived of the freedom "to be with his family and friends and to form the other enduring attachments of normal

life," *Morrissey v. Brewer*, 408 U. S. 471, 482 (1972). Indeed, the Supreme Court has previously recognized that incarceration is an "infamous punishment." *Flemming v. Nestor*, 363 U. S., at 617; see also *Wong Wing v. United States*, 163 U. S. 228, 233-234 (1896); *Ingraham v. Wright*, 430 U. S. 651, 669 (1977). And if the effect of incarceration itself is inevitably punitive, so too must be the cumulative impact of those restraints incident to that restraint. See *Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000) (finding allegations of inadequate drinking water over four days, <u>along with other deprivations</u>, sufficient to state an Eighth Amendment claim).

Conditions of confinement, even if not individually serious enough to work constitutional violations, may violate the Constitution in combination when they have "a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). Each of the complained conditions must be measured by its severity and duration, not the resulting injury, and none of these conditions is subject to a bright-line durational or severity threshold. Moreover, the conditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another. See *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting the synergy between cold temperatures and the failure to provide blankets in establishing an Eighth Amendment violation). An overcrowded cell, for example, may exacerbate the

effect of unsanitary conditions. Similarly, poor ventilation may be particularly harmful when combined with an overflowing toilet. Inadequate nutrition may be compounded by infestation. *Darnell v. Pineiro*, 849 F.3d 17, 32 (2d Cir. 2017).

*Darnell* involves conditions in Brooklyn Central Booking, a pre-arraignment holding only facility, in which no one was held for more than twenty-four hours, the Second Circuit held that the District Court erroneously granted summary judgment for the defendants on the basis that the conditions in the case did not exceed ten to twenty-four hours, or result in serious injury or sickness. *Id*. at 36-37. See also *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) (rejecting the argument that a plaintiff must prove a serious injury in order to establish a constitutional violation due to inhumane conditions of confinement.)

The law does not authorize that jail officials are free to set a system in place whereby they can subject pretrial detainees awaiting arraignment to absolutely atrocious conditions for twenty-four hour periods (and perhaps more) without violating the Constitution so long as nothing actually catastrophic happens during those periods. *Darnell v. Pineiro*, 849 F.3d 17, 37 (2d Cir. 2017). Adopting an opposite view to the Second Circuit's interpretation would weaken the protections provided by the Constitution to pretrial detainees and undermine the standard set forth by *Kingsley*.

**III.   EXCESSIVE GROUP STRIP SEARCHES, CONDUCTED IN OPEN HALL WAY, REQUIRING FEMALE INMATES TO PULL DOWN THEIR UNDERWEAR AND SHOW THEIR BLOODY FEMININE PADS WERE COMPLETELY UNPROFESSIONAL, DEGRADING AND OFFENSIVE**

### A. Cal. Penal Code §4030 Applies to Doe

Fifteen states have statutorily defined strip searches in broad terms that include a visual inspection of underclothing or breasts where complete nudity is not required. Cal.Penal Code §4030(c) (3); Colo.Rev.Stat. Ann. §16–3–405(2); Conn. Gen.Stat. Ann. §54–33k; Fla. Stat. Ann. §901.211(1); 725 Ill. Comp. Stat.. 5/103–1(d); Iowa Code Ann. §702.23; Kan. Stat. Ann. §22–2520(a); Mich. Comp. Laws. Ann. §764.25a(1); Mo. Ann. Stat. §544.193(1)(2); N.J. Stat. Ann.. § 2A:161A–3(a); Ohio Rev.Code Ann. §2933.32(A)(2); Tenn.Code. Ann. §40–7– 119(a); Va.Code Ann. §19.2–59.1(F); Wash. Rev.Code Ann.. §10.79.070(1); Wis. Stat. Ann.. §968.255(1) (b). See, e.g. *Foster v. City of Oakland*, 675 F.Supp.2d 992, 1003 (N.D.Cal.2009) (**there is no reason for this court to conclude that a visual inspection of [arrestee]'s underwear was not a "strip search"**); *State v. Nieves*, 383 Md. 573, 861 A.2d 62, 70 (2004) ("strip searches involve the removal of the arrestee's clothing for inspection of the under clothes and/or body.")

Despite clear statutory definition of strip search, WCJ invents a euphemism to mask or conceal the true nature of strip search. ECF 139-3 at 37, Joint Statement Fact. No. 40. WCJ's sugarcoated "Extended Custodial Search," a body search that

requires inmates to remove all garments except their undergarments (bras and

panties for females), is exactly the strip search defined by Cal. Penal Code §

4030(c)(3). WCJ's Extended Custodial Search is a direct conflict with the

definition of the phrase found in Cal. Penal Code §4030(c)(3). Despite Cal. Penal

Code §4030(e) requires that a strip search or visual body cavity search, or both,

shall not be conducted without the prior written authorization of the supervising

officer on duty, due to the effect of a euphemism, WCJ's policy unreasonably

allows WCJ staff to conduct strip search without authorization or privacy to violate

pretrial detainees' constitutional rights and therefore unconstitutional. The term

"Extended Custodial Search" downplays the seriousness of strip search and

obscures the true impact of laws, policies, or actions, limiting public scrutiny and

accountability. By disguising or distorting the true meaning of strip search,

Extended Custodial Search can incorrectly shape public opinion, sway perceptions,

and control narratives. There was no penological practical reason for inventing

such term, given that the term "strip search" is used to protect inmates' state and

federal constitutional rights to privacy and freedom from unreasonable searches

and seizures. Cal. Penal Code §4030(a). WCJ's practice is apparently for the

purpose of perpetuating and justifying abuse.

Cal. Penal Code §4030 (l) provides that all strip, visual, and physical body

cavity searches shall be conducted in an area of privacy so that the search cannot

be observed by persons not participating in the search.

There is no genuine issue of material fact in dispute here as to (1) all seven strip searches were conducted in open hall way; (2) hall way is not an area of privacy; (3) fellow pretrial detainees are not persons participating in the search; (4) all seven strip searches were able to be observed by fellow pretrial detainees.

The district court's conclusion is a plain error that Cal. Penal Code §4030 has no application to the searches alleged by Doe. §4030 does not authorize strip search without privacy so long as the pretrial detainees are placed in general population.

### B. Excessive Group Strip Search Is Unnecessary Or Unjustified Response to Problems of WCJ's Security

Not all strip search procedures will be reasonable; some could be excessive, vindictive, harassing or unrelated to any legitimate penological interest. *Michenfelder v. Sumner*, 860 F.2d 328, 332-333 (9th Cir. 1988). Even if a strip search is justified, it may be unconstitutional if it is conducted in an unreasonable manner or place.

Scope and manner. In *Bell*, the Court held that searches of pretrial detainees must be "reasonable" in light of the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. 441 U.S. 559.

The strip searches are conducted on pretrial detainees in a group between 10 and 20 women, in open hall way and are visual only, involving no touching. See *Kirkpatrick v. City of Los Angeles*, 803 F.2d 485, 489–90 (9th Cir. 1986) ("[T]he fact that a strip search is conducted reasonably, without touching and outside the view of all persons other than the party performing the search, does not negate the fact that a strip search is a significant intrusion on the person searched.") The necessity of a search and its extent cannot be determined in a vacuum. *Brown v. Polk Cnty.*, 141 S. Ct. 1304, 1305 (2021). It must instead "be judged in light of the availability of ... less invasive alternative[s]." *Birchfield v. North Dakota*, 136 S. Ct. 2160, 2184 (2016). Courts must consider less intrusive possibilities before categorically allowing warrantless searches. This obligation weighs particularly heavily for dehumanizing searches of pretrial detainees. *Brown v. Polk Cnty.*, 141 S. Ct. 1304, 1307 (2021). Based on the evidentiary record, a notable absence of evidence exists to elucidate the rationale behind conducting strip searches in a group setting and requiring menstruating women to expose their bloody pads despite they could have been afforded privacy in a room or the search could have been conducted using body scanners. Absent any compelling justification presented within the record, a reasonable trier of fact could reasonably infer that such practice is, at least in part, a consequence of the prevailing conditions of overcrowding and understaffing at WCJ. The frequency of strip searches in WCJ

are very high. Pretrial detainees are searched both coming and leaving their cells, even when traveling only within the facility without outside contact while under escort or supervision. Pretrial detainees are also searched when travelling to and from court while under escort and in chains at all times, including after they are ordered to be released by the court and right before they are released. While female pretrial detainees are on period they are required to pull down their underwear, lift up their bloody feminine pad, and twist it in front of the deputies and other inmates. This practice sends a message to women that they are not entitled to basic dignity and respect while in custody, and that their bodies are nothing more than objects to be inspected and scrutinized. Such a practice involves an invasion of privacy and exposes the individual to a humiliating and dehumanizing experience. It is highly degrading and violates basic principles of human dignity. It also creates a risk of psychological harm and can lead to feelings of shame and trauma. This type of search is particularly intrusive for women who may have experienced past trauma or abuse, and can exacerbate their trauma and undermine their sense of safety and security.

Justification. Doe, as a pretrial detainee with charges not involving weapon or contraband, was pat-down searched and forced to take a mandatory shower in the view and presence of WCJ staff and fellow inmates. Jail daily logs show that no weapon or contraband were ever found during group strip searches. Jail daily

logs show no significant violence or drug problems in WCJ. In light of the absence of any pervasive and serious problem with contraband or weapon inside WCJ, the absence of weapon or contraband ever found during strip searches, and the fact that Doe, with no charges involving weapon or contraband, had already undergone a pat-down search and mandatory shower showing her naked body to WCJ staff, the seven strip searches of Doe was unnecessary, unjustified, and exaggerated response to jail officials' need for prison security. Particularly Doe was strip searched after she was granted release and right before she was released.

Place. Doe has met her initial burden in support of her assertion that group strip searches conducted in open hallway are unreasonable. Defendant produced no evidence showing that there are no genuine issues of material fact. All they claim is that the seven searches conducted on Doe are not strip searches. However, even if they were not strip searches Defendant produced no evidence showing that requiring Doe to wear a bra in open hall way and forcing female pretrial detainees to show their bloody feminine pads in open hallway in a group setting is reasonably related to legitimate penological interests. See *Robins*, *supra,* at 550 (holding that the clothed body search when a correction officer inappropriately groped Robins was completely unprofessional and offensive, and, therefore, not analogous to the pat down searches of inmates that included the groin area upheld in *Grummett v. Rushen*, 779 F.2d 491, 496 (9th Cir.1985).)

## IV.    MIDNIGHT CELL SEARCH ON AUGUST 11, 2019 VIOLATED DOE'S CONSTITUTIONAL RIGHTS UNDER FOURTH AND FIRST AMENDMENT

To begin with, throughout the entire discoverable period, there was a noticeable absence of midnight cell searches other than the August 11, 2019 midnight shakedown. ECF 93-1 at 4-14; 36-99.

On July 18, 2019, only one FAST search was conducted. On July 19, 2019, a makeup search was conducted on the roof to compensate for the failure to conduct the usual two FAST searches per day on the previous day. ECF 93-1 at 57-60. On July 26, 2019, only one FAST search was conducted. On July 27, 2019, no makeup search was conducted despite the failure to conduct the typical two searches per day on the preceding day. ECF 93-1 at 74-76. On July 28, 2019, only one FAST search was conducted. On July 29, 2019, similarly, no makeup search was conducted despite the failure to conduct the usual two searches per day on the previous day. ECF 93-1 at 77-80.

If a FAST search cannot be completed as scheduled or is deviated from, the Watch Commander shall document the reason in the Custody Operations Supervisor's Log. ECF 139-6 at 107. Despite the absence of any FAST search on August 10, 2019, Defendants failed to provide any documented reason as required by WCJ policy for not conducting a FAST search. This omission raises significant concerns, particularly regarding the possibility that the decision not to conduct a

FAST search on August 10, 2019 may have been a deliberate strategic choice. It is conceivable that this decision was made with the intention of concealing the true motives behind the subsequent midnight shakedown on August 11, 2019.

### A. Harassing Midnight Cell Search Violated Fourth Amendment

The district court's reliance on *Hudson v. Palmer*, 468 U.S. 517, 530 (1984), which held that prisoners have no legitimate expectation of privacy and that the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells, is misplaced in the context of the present case. First, Doe is not a convicted prisoner serving a sentence, as was Palmer. Second, inmates in jails, prisons, or mental institutions retain certain fundamental rights of privacy; they are not like animals in a zoo to be filmed and photographed at will by the public or by media reporters, however "educational" the process may be for others. *Houchins v. KQED, Inc*., 438 U.S. 1, 5, n. 2 (1978) (plurality opinion) (citation omitted). As such, is the Court correct in its perception that "society" is not prepared to recognize any privacy or possessory interest of the prison inmate — no matter how remote the threat to prison security may be? What is the justification for applying this rule to minimum security facilities in which inmates who pose no realistic threat to security are housed? What is the justification for reading the mail of a prisoner once it has cleared whatever censorship mechanism is employed by the prison and has been received by the prisoner? The Court's ruling in *Hudson* should

not be applied categorically to all situations involving inmate privacy. The rights of pretrial detainees, particularly regarding privacy interests, must be assessed with due consideration to their unique status and the evolving standards of decency within correctional facilities. A prison official's judgment about how extensively to search a cell involves a balancing of the potential risk, on the one hand, against the inmate's interest in being free from overly intrusive searches, on the other. *Alfrey v. U.S.*, 276 F.3d 557, 565 (9th Cir. 2002).

Since *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court has applied the Fourth Amendment whenever "the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). This is a two-part inquiry. First, the individual must exhibit a subjective expectation of privacy in the object of the challenged search. See *Smith v. Maryland*, supra, at 740. The Court has noted that in some situations the absence of any subjective expectation of privacy would not defeat an individual's Fourth Amendment claim. See *Smith v. Maryland*, 442 U.S., at 740. See also Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 384 (1974).

In the context of searches of pretrial detainees' cells, courts must balance the government's interest in maintaining security and order in correctional facilities against the detainees' privacy rights, no matter how diminished they are. In *United*

*States v. Cohen*, 796 F.2d 20 (2d Cir. 1986), the court held that an expectation of privacy existed in the prisoner's cell when the warrantless search was conducted for nonsecurity reasons. *Id*. at 20-24.

The time of a search is a relevant factor in determining its reasonableness. Searches of pretrial detainees' cells during sleeping hours are inherently more intrusive and require greater justification than searches conducted during the day. The greater the deprivation on detainees, the heavier the burden of justification the Government would bear. See *Bates v. Little Rock*, 361 U. S. 516, 524 (1960); *Shapiro v. Thompson*, 394 U. S. 618, 634 (1969); *Kusper v. Pontikes*, 414 U. S. 51, 58-59 (1973).

In the present case, the intrusion by midnight search on pretrial detainees' Fourth Amendment rights is significant, as they are likely sleeping and have a heightened expectation of privacy, namely expectation not to be interrupted. Moreover, there may be less of a need for searches during sleeping hours, as most detainees are likely asleep and not engaging in activities that could threaten the security or order of the facility.

On August 11, 2019, there was no compelling justification for conducting any midnight search. WCJ failed to show that the midnight search was necessary to maintain security and order in the facility and that conducting searches during the day would be insufficient to achieve this goal.

## B. Retaliatory Midnight Cell Search Violated First Amendment

Verbal communication is one of the oldest forms of human expression. See *Ward v. Rock Against Racism*, 491 U.S. 781, 790 (1989) (holding that music, as a form of expression and communication, is protected under the First Amendment.) First Amendment guarantees are interposed to protect communication between speaker and listener. Mutual communication between inmates, both speakers and listeners, is protected by First Amendment and Cal. Const. Art. I, §2. The size of the audience has been deemed wholly irrelevant to First Amendment issues. One has a right to freedom of speech whether he talks to one person or to one thousand. One has a right to freedom of speech not only when he talks to his friends but also when he talks to the public. *United States v. Auto. Workers*, 352 U.S. 567, 595 (1957).

The First Amendment involves not only the right to speak and publish but also the right to hear, to learn, to know. *Martin v. City of Struthers*, 319 U.S. 141, 143; *Stanley v. Georgia*, 394 U.S. 557, 564. The right to speak implies a freedom to listen, *Kleindienst v. Mandel*, 408 U.S. 753. The right to publish implies a freedom to gather information, *Branzburg v. Hayes*, 408 U.S. 665, 681. The district court erred in concluding that Doe has changed the theory of her First Amendment claim, alleging instead that the search violated the First Amendment because it

interfered with the inmates' right to "receive information while incarcerated." ECF 163 at 65.

"[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). Free speech carries with it some freedom to listen. "In a variety of contexts this Court has referred to a First Amendment right to 'receive information and ideas.'" *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both. *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 756 (1976).

There is no statute or case law to suggest that prisoners do not have a right to speak to correctional officers. See, e.g., *Clark v. Woodford*, 36 Fed. Appx. 240, 241 (9th Cir. 2002). Similarly, there is no statute or case law to suggest that detainees do not have a right to speak to their cell mates.

The policy rationale for the recognition of a cause of action for governmental acts motivated in substantial part by a desire to punish an individual or group for the exercise of First Amendment rights was succinctly stated by the Supreme Court in *Hartman v. Moore*, 547 U.S. 250 (2006), where the Court held:

"Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" *Id*. at 256 (quoting *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998)) (alteration in original).

Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). The prisoner need not prove a total chilling of his First Amendment rights; "that his First Amendment rights were chilled, though not necessarily silenced, is enough." *Rhodes*, 408 F.3d at 569.

(1) Defendants Took Adverse Action Against Doe and All other inmates in her cell

"[T]he interest cognizable in a retaliation claim is the right to be free of conditions that would not have been imposed but for the alleged retaliatory motive." *Garcia v. Blahnik*, No. 14cv875-LAB-BGS, 2017 WL 1226863, at *10 (S.D. Cal. Feb. 3, 2017). It is well established that governmental actions that do not violate the Constitution on their face may, nevertheless, become actionable constitutional "torts" if it is demonstrated that the contested acts were motivated in

substantial part by a desire to punish an individual or group for the exercise of a constitutional right. See, e.g., *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited"); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) ([D]eprivations less harsh than dismissal can sometimes qualify as adverse action too.)

Here, Doe asserts there was an adverse action taken against her, in that her cell was searched after midnight and defendants thereafter announced threat of repeated midnight searches for the purposes of banning of all communication between inmates. Each such action is sufficient to constitute adverse action. See e.g., *Vignolo v. Miller*, 120 F.3d 1075, 1078 (9th Cir. 1997) (holding discharge from prison job in retaliation for exercise of constitutional right constitutes adverse action despite absence of constitutional right to prison job). The fact that the search was conducted after midnight raises a plausible inference of wrongdoing. The fact that defendants threatened repeated midnight searches further demonstrates and bolsters Doe's allegations that the actions were retaliatory for the purposes of banning of all communication between inmates.

(2) Defendants Took Adverse Action Against Doe because of mutual communication between inmates

Doe further asserts these acts were not taken in response to a penological interest in maintaining order and prison security, but rather as retaliation for her and other inmates having communicated with each other. No reasonable or decent officer would choose midnight to express frustration at daytime noise levels in Doe's module. No reasonable officer would choose to ban all communication and threaten repeated midnight searches due to daytime noise levels.

The district court concludes that there is no evidence that Doe had engaged in any First Amendment expressive activity prior to the midnight search of her module and she did not socialize with many people while she was at the Jail. ECF 163 at 71. In her own deposition, however, Doe was asked if she spoke to anyone while she was in custody. Doe testified she had a handful of conversations with other inmates. ECF 139-5 at 92-94. Nowhere in the First Amendment suggests that it protects only extensive conversation instead of small talks. In any event, Doe has a valid First Amendment retaliation claim against the defendants, as they mistakenly believed that she engaged in communication with other inmates, despite the fact that she did not actually do so. The defendants' mistaken belief, even if unfounded, does not diminish the fact that they retaliated against Doe based on their perception of her conduct. See *Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016) (holding that whether the protected speech was actually engaged in by the employee is not determinative because it is the perception of the

employer as to whether that protected activity occurred that matters to a First Amendment retaliation claim). Based on the announced threat of repeated midnight searches, there is no doubt that defendants knew of the First Amendment activity.

A plaintiff successfully alleges a motivating factor by including facts like: "(1) proximity in time between protected speech and the alleged retaliation; (2) that the defendant expressed opposition to the speech; or (3) other evidence that the reasons proffered by the defendant for the adverse . . . action were false and pretextual." *McCollum v. CDCR*, 647 F.3d 870, 882 (9th Cir. 2011) (alterations and quotation marks omitted). See also *Crawford-El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (holding that a prisoner bringing a § 1983 action against government official need not present clear and convincing evidence of official's improper motive in order to defeat official's motion for summary judgment.)

Retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence. See *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1316 (9th Cir. 1989) (holding that timing can properly be considered as circumstantial evidence of retaliatory intent.) In this instance, Doe has shown that the August 11, 2019 search occurred after midnight absent any routine midnight cell search practice. Doe and other inmates received threat of

repeated midnight searches for the purposes of banning of all communication between inmates. Additionally, Doe has submitted evidence of inconsistency with previous actions, in that she states during the entire discoverable period, there was no other midnight cell search and in many occasions no major jail rule violations were written up even when razors were found. See *Bruce*, 351 F.3d at 1289 (triable issue existed as to whether the motive for a gang validation was retaliatory based on statements indicating that the validation was payback for earlier complaints, combined with suspect timing and the use of evidence previously rejected).

As to the third of the *Rhodes*' five elements, Doe has submitted evidence sufficient to show the asserted retaliation was because of protected conduct, specifically, mutual communication between inmates.

With respect to the fourth element, although Doe must show her First Amendment rights were "chilled," a prisoner, as noted, need not show a total chilling of her First Amendment rights in order to establish a retaliation claim. See *Rhodes*, 408 F.3d at 568-69 (rejecting argument that inmate failed to state retaliation claim where, after alleged adverse action, plaintiff nonetheless had been able to file inmate grievances and lawsuit). Here, as in *Rhodes*, Doe has alleged she and other inmates dared to make a sound the next day. ECF 149-2 ¶9. Such action is sufficient to chill Doe's First Amendment Rights, irrespective of whether Doe was actually inhibited. None of any *Rhodes* elements requires Doe to show the

threatened consequence actually happened as the district court incorrectly

suggested. ECF 163 at 69. Although cell searches are a routine part of prison life,

see *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984), a cell search may nonetheless

constitute an adverse action, as such an action need not be an independent

constitutional violation, see *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). An

otherwise permitted action can be the basis for a retaliation claim if performed with

a retaliatory motive and lacking a legitimate correctional goal. *Watison v. Carter*,

668 F.3d 1108, 1115 (9th Cir. 2012). Even if a plaintiff fails to allege a chilling

effect, he may still state a claim by alleging that he suffered some other "more than

minimal" harm. Id. See also *Mendocino Envtl Ctr v. Mendocino County*, 192 F.3d

1283, 1300 (9th Cir. 1999) (noting "it would be unjust to allow a defendant to

escape liability for a First Amendment violation merely because an unusually

determined plaintiff persists in his protected activity, we conclude the proper

inquiry asks 'whether an official's acts would chill or silence a person of ordinary

firmness from future First Amendment activities.'") (citations omitted); *Brodheim*

*v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009); *Wilson v. Nesbeth*, 341 Fed. Appx.

291, 293 (9th Cir. 2009) (unpublished) ("This court has previously concluded that

allegations of harm were sufficient to ground a First Amendment retaliation claim

without discussing whether that harm had a chilling effect.") (citing Pratt, 65 F.3d

at 807-08); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989);

*Haddix v. Burris*, 2015 U.S. Dist. LEXIS 29281, at *21-22 (N.D. Cal. Mar. 10, 2015) (unpublished) (finding retaliatory cell searches could satisfy the required chilling effect element of a First Amendment retaliation claim); *Davis v. Runnels*, 2013 U.S. Dist. LEXIS 106000, at *18-19 (E.D. Cal. July 29, 2013) (unpublished) (same).

Lastly, to satisfy the fifth element, a plaintiff must show the asserted retaliatory action advanced no penological interest. In that regard, the prisoner "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). "A plaintiff successfully pleads this element by alleging, in addition to a retaliatory motive, that the defendant's actions were arbitrary and capricious . . . or that they were 'unnecessary to the maintenance of order in the institution.'" *Watison v. Carter*, 668 F.3d 1108, 1114-15 (9th Cir. 2012) (quoting *Franklin v. Murphy*, 745 F.2d 1221, 1230 (9th Cir. 1984)) (internal citations omitted). At that point, the burden shifts to the prison official to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. *Schroeder v. McDonald*, 55 F.3d 454, 461-62 (9th Cir. 1995).

Here, Doe contends there was no compelling reason to conduct midnight cell search because searches before inmates went to bed were able to serve the same

legitimate correctional goal and midnight search is no a common practice in WCJ. Jail daily logs show no significant or ongoing violence or drug problems in WCJ to justify a midnight cell search. Defendants presented no evidence showing that midnight search was narrowly tailored to serve a legitimate penological purpose other than a general assertion that the midnight search was random search according to jail policy.

Defendants have not identified in their motion, let alone in any declaration or exhibit submitted in support thereof, what they could not have found if the search had been conducted before inmates went to bed. Accordingly, the defendants have not demonstrated the absence of a triable issue as to whether the August 11, 2019 midnight search was conducted for retaliation, and, consequently, a triable issue remains as to whether the midnight search served any penological purpose. The absence in the record of any evidence consistent with defendants' explanation that midnight search was common practice, coupled with Doe's competent testimony as to a retaliatory animus, creates a triable issue of fact as to whether the midnight search served a penological purpose and was conducted for retaliation. Viewing the evidence in the light most favorable to the nonmoving party, a reasonable jury could disbelieve defendants' statement that the search was conducted at random, given that defendants did not identify any other midnight cell search. See *Bruce*, 351 F.3d at 1289 ("prison officials may not defeat a retaliation

claim on summary judgment simply by articulating a general justification for a neutral process, when there is a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right").

Doe's protected conduct was the motivating factor for the adverse action. By Defendants' own admission, then, the entire purpose for the August 11, 2019 midnight search and, by extension, the motivation for the threat of repeated midnight searches, was to achieve to ban all communication between inmates.

## V. WCJ'S UNCONSTITUTIONAL PRACTICES, CUSTOMS OR POLICIES PRECLUDE THE AWARD OF SUMMARY JUDGMENT

The district court erroneously finds that Claims 4 and 5 – were brought only against the five Deputy Defendants and not directly against the County. ECF 163 at 72. However, Claims 4 and 5 – were brought against both the five Deputy Defendants and the County. ECF 56 at 19-20.

Unconstitutional – Strip Search Policy

By cloaking sensitive or unpleasant truths with more socially acceptable or less explicit language, "Extended Custodial Search" instead of Strip Search can mislead people and prevent them from fully grasping the true meaning and implications of a given situation. The utilization of a euphemism "extended custodial searches", along with the application of a distinct definition of strip search deviating from the parameters outlined in Cal. Penal Code §4030(c)(3), is

substantially certain to violate an individual's constitutional rights.

Unconstitutional – Mandatory Nude Shower Policy, Hallway Bra Wearing
Policy, and Naked Release Procedure

WCJ maintains a policy that requires female pretrial detainees to be
completely naked in front of jail staff and other inmates before being placed in
general population during the process of showering, including obtaining a jail
uniform, taking a shower, and getting dressed. As a result of the traumatic
experience caused by the Mandatory Nude Shower Policy, Doe was unable to take
another shower at WCJ for the duration of her incarceration. The distressing nature
of the policy had a lasting impact on Doe's psychological well-being, leading to her
involuntary refusal to partake in any further showers during her time at WCJ. This
deprivation of the ability to maintain personal hygiene further exacerbated the
harm caused by the policy and violated Doe's fundamental rights.

WCJ requires female pretrial detainees to wear a bra in the hallway without
giving them access to bathroom. ECF 149-2 at 3.

During the release process, WCJ also requires female pretrial detainees to be
completely naked in the presence of jail staff and other inmates when exchanging
the jail uniform for their own clothing.

No evidence in the record suggests that these policies, requiring female
pretrial detainees to be completely naked throughout the entire showering process

and during release, and wearing a bra in the hallway were reasonable or necessary to serve a legitimate penological purpose, such as security, hygiene, or maintaining order within the jail.

Giving Doe the benefit of favorable inferences from the record, a reasonable trier of fact could find that these policies are not rationally related to a legitimate governmental objective, or are at least excessive in relation to such a purpose. This conclusion supports an inference that the policy punishes pretrial detainees in violation of the Fourteenth Amendment. *Kingsley*, 576 U.S. at 396-340; *Bell*, 441 U.S. at 539.

In *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 855 (7th Cir. 2017) the Court acknowledges a credible dignitary harm, finds no evidence that detainees have ever extracted ink from colored underwear to make tattoos, emphasizes that even a seemingly innocuous condition can be deemed punitive if it lacks a legitimate purpose or is excessive, and holds that the policy that requires female detainees to wear white underwear or no underwear at all bars summary judgment.

The three policies in WCJ lack a rational relationship to a legitimate governmental objective and impose excessive deprivation, thereby infringing upon Doe's dignity interests. These policies go far beyond the mere requirement of white underwear and entail a significantly more intrusive and demeaning procedure for

the detainees.

Unconstitutional – Overcrowding Practice

The overcrowding condition at WCJ has a detrimental impact on various aspects of the detainees' experience, exacerbating issues such as the extreme noise generated by flushing toilets and the lack of meaningful recreation opportunities. Additionally, it is worth noting that overcrowding may also contribute to the denial of food, excessive noise caused by inmates' conversations, and the implementation of group strip searches to some extent.

The denial of food could be a consequence of limited resources and inadequate provisions due to the strain caused by accommodating a larger inmate population than the facility can adequately handle. Similarly, the excessive noise generated by inmates' conversations may stem from the overcrowded living conditions, where individuals are closely confined and interactions are inevitable. When resources and personnel are stretched thin due to an overcrowded facility, authorities may resort to group strip searches as a way to manage the large number of detainees. The overcrowding condition at WCJ has far-reaching implications for the detainees' well-being and rights.

Unconstitutional – Maintaining Bone Chilling Temperature While Denying to Issue Blanket

The fact whether the first floor temperature was bone chilling is hotly

disputed. The District Court placed greater weight on O'Connell's uncorroborated and self-serving Declaration that the average temperature system set point is 70 degrees and wholly disregarded Doe's expression that she was cold to death and the description of freezing cold by other inmates.

The practice of maintaining bone-chilling temperatures at WCJ while simultaneously denying detainees the issuance of blankets is an unconstitutional practice that violates their fundamental rights. This practice serves no legitimate penological purpose. It does not further the objectives of maintaining security, order, or discipline within the correctional facility. Instead, it inflicts unnecessary suffering on individuals who are in the custody of WCJ, without any justifiable reason.

### Unconstitutional – Pretrial Detainees Can Be Punished

The County has admitted that pretrial detainees can be punished. ECF 149-2 at 203-204. By acknowledging that pretrial detainees can be punished, the County disregards the constitutional rights of these individuals. This practice creates an unjust and oppressive environment for those who are merely awaiting trial. Any policy or custom that allows for the punishment of pretrial detainees lacks a legitimate governmental objective and runs afoul of their constitutional rights. The denial of clothing to keep warm and repeated denial of food by multiple jail employees, such open misconduct committed by multiple officers, represents the

County's official policy and consistency that the conduct has become a traditional method of carrying out policy. See *Menotti v. City of Seattle*, 409 F.3d 1113, 1148 (9th Cir. 2005) (holding that a plaintiff may prove a widespread practice where several different officers independently engage in the same unconstitutional conduct.)

Unconstitutional – Recreation Policy

The lack of meaningful indoor recreation in WCJ is objectively unreasonable. An indoor 350-square-foot dayroom is behind four toilets of Doe's cell. ECF 93-1 at 34. The 350-square-foot dayroom is unable to provide any meaningful recreation for 40 women.

45-minute-per-week outdoor recreation is objectively unreasonable. Courts have confirmed, time and time again, that the Constitution requires jail officials to provide outdoor recreation opportunities, or otherwise meaningful recreation, to prison inmates. *Shorter v. Baca*, 895 F.3d 1176, 1185 (2018). In *Spain v. Procunier*, this Court concluded that violent inmates in administrative segregation have a "right of outdoor exercise one hour per day, five days a week unless inclement weather, unusual circumstances, or disciplinary needs made that impossible." 600 F.2d at 199. This Court also concluded that "[t]he cost or inconvenience of providing adequate facilities is not a defense" to the imposition of punishment in violation of the Fourteenth Amendment. *Id*. at 200.

WCJ offers no specific reason for its recreation policy. Nor does WCJ explain why it could not provide outdoor recreation one hour per day, seven days a week. The policy was not adopted in response to an emergency or a dangerous situation that required jail officials to use their expertise to prevent further violence. See *Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017) (instructing jail officials to tailor conditions to particular features of a detention facility and the length of detention.) And, WCJ cannot justify its recreation policy by a general statement that 8.75 (350/40=8.75) square feet per person dayroom without window and natural light is provided because this Court has concluded that all inmates are entitled to an individualized evaluation and recreation, barring inclement weather, unusual circumstances, or severe and imminent security risks. See *Spain*, 600 F.2d at 199.

### Unconstitutional – 24-hour over-the-bed lighting Policy

24-hour over-the-bed lighting, even under the guise of security concerns, is excessive and is substantially certain to violate an individual's constitutional rights. While ensuring the safety of both detainees and staff is undoubtedly a legitimate goal, it is essential to assess whether the practice of continuous over-the-bed lighting is reasonably related to achieving this objective or if it goes beyond what is necessary and becomes excessive in relation to the purpose.

There is no evidence to suggest that Doe posed a higher risk of danger to

anyone within the correctional facility. Therefore, the practice of placing a light directly over Doe's bed and leaving it on for 24 hours lacks a reasonable justification and raises concerns regarding its constitutionality.

In order to maintain security within the facility, alternative lighting arrangements can be implemented. Placing the lighting in locations other than directly over Doe's bed, without subjecting Doe to the constant illumination of a light directly over her bed, would still serve the necessary security purposes without infringing upon Doe's constitutional rights.

It is essential to ensure that security measures are implemented in a manner that is both effective and respectful of the rights of pretrial detainees in custody. In the absence of evidence indicating a specific risk or need for a light directly over Doe's bed, such a practice can be seen as arbitrary, purposeless, excessive, and unconstitutional.

<u>Unconstitutional - Hygienic Supplies Practice</u>

There is no evidence in the record suggesting that Doe was informed that she could obtain additional soap and toothpaste for free. There is no evidence in the record indicating that Doe was offered free soap and toothpaste two days after the initial supply despite the initial supply was enough only for two days. ECF 56 at 13. The district court asserts that Doe has not shown that she actually ran out of soap or toothpaste. However, the County did not dispute that the Welfare Pack

could last only for two days. It is the County's practice to force inmates to pay for hygienic supplies regardless of its written policy. Inmates who requested indigent pack would never receive one. ECF 149-2 at 12.

There is no dispute that shampoo is one of the basic hygienic supplies and the County forced inmates to purchase shampoo. Hygienic supplies sufficient to meet basic needs are constitutionally required; it is not enough for the prison to "allow" inmates to purchase them. *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016). Regardless of whether the pretrial detainees are indigent, forcing them to purchase basic hygienic supplies is objectively unreasonable and does not serve a legitimate penological purpose.

## VI.  WCJ'S ACTS, OMISSIONS OR CONDITIONS, VIEWED IN TOTALITY, ARE OBJECTIVELY UNREASONABLE AND CONSTITUTE PUNISHMENT TO DOE

The Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018). With the inevitably punitive effect of incarceration itself and Doe's status as a pretrial detainee in mind, this court must consider the cumulative impact imposed on Doe by WCJ.

In *Johnson v. Pelker*, 891 F.2d 136 (7th Cir. 1989), the court reversed a grant of summary judgment for the defendants because "placing a prisoner in a cell for three days without running water and in which feces are smeared on the walls

while ignoring his requests for cleaning supplies" could violate the Eighth Amendment. *Id.* at 139.

The temporary nature of pretrial detainees' confinement did not justify the wholesale and routine deprivation of meals, blankets, privacy, sleep, basic human dignity, or meaningful recreation activities.

Incarceration of itself clearly represents a profound infringement of liberty, and each additional deprivation increases the severity of that initial deprivation. See *Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004) (concluding that streaming images of pretrial detainees on the web constitutes a harm because the additional impact on pretrial detainees of webcam transmission was greater than the intrusion inherent in incarceration.)

Deprivation of Food and Blanket at The Same Time In Bone Chilling Condition Amounts to Punishment and Exceeded "The General Level of Discomfort Anyone Can Expect to Experience While in Custody"

*Foster v. Runnels,* 554 F.3d 807 (9th Cir. 2009)*, Mendiola-Martinez v. Arpaio,* 836 F.3d 1239 (9th Cir. 2016), *Keenan v. Hall*, 83 F.3d 1083 (9th Cir. 1996) and *Frost v. Agnos*, 152 F.3d 1124 (9th Cir. 1998), relying by the district court, are easily distinguishable. ECF 163 at 21-22, 29-30. First, they applied the more demanding Eighth Amendment deliberate-indifference standard, as opposed to the objective inquiry that should be applied here. Cases applied the Eighth

Amendment subjective deliberate indifference standard are of limited relevance to the Fourteenth Amendment claims here. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 671 (9th Cir. 2021). Second, none of them involve food deprivation in bone chilling condition. See *Dearman v. Woodson*, 429 F.2d 1288, 1290 (10th Cir. 1970) (holding that whether relief may be granted under 42 U.S.C. § 1983 must consider facts and circumstances surrounding the withdrawal of food from prisoners.)

A reasonable officer in the circumstances would have appreciated the gravity of Doe's statement that she was cold to death regardless of whether the officer personally felt cold. See *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (Holding that complaint alleging that prison officials deliberately failed to provide blankets in "extremely cold indoor air" stated an Eighth Amendment claim.) A reasonable jury can easily find "Don't come to jail next time" an expressed intent to punish.

Doe was deprived of any food, whether cold or hot, at WCJ the entire day on August 8, 2019. In *Woods v. Thieret*, the court stated that an allegation of three days without food (more specifically, <u>one full day without food</u>, sandwiched between days without dinner or break-fast) stated a claim for a violation of the Eighth Amendment. 903 F.2d at 1082. Doe was subjected to an environment with bone-chilling conditions for over 12 hours, all while being denied access to any

food and blanket. ECF 149-2 at 2-3. WCJ's denial lacks any reasonable connection to a legitimate governmental objective. A jury could conclude the denial, both by the nurses and officer, was akin to reckless disregard and objectively unreasonable.

<u>Unwarranted Forced Nudity Amounts to Punishment</u>

Exposing a person's naked body involuntarily is a severe invasion of personal privacy. *Colbruno v. Kessler*, 928 F.3d 1155, 1164 (10th Cir. 2019). It is common sense that forcing someone nude in public is not so insignificant, and the Fourth Amendment jurisprudence makes the point crystal clear. *Id*. at 1165. In *Doan v. Watson*, 168 F.Supp.2d 932 (S.D. Ind. 2001), the observation of misdemeanor arrestees while showering and delousing prior to being dressed in prison-issued uniforms by officers was found to violate the prisoners' Fourth Amendment rights. Observation of a detainee while she changed into a jail-issued uniform was characterized as a strip search in *Burns v. Goodman*, 2001 WL 498231 (N.D. Tex. May 8, 2001), aff'd, 2002 WL 243248 (5th Cir. Jan. 16, 2002), cert. denied, 537 U.S. 840 (2002).

The act of compelling Doe to wear a bra in an open hallway without providing her access to a bathroom, requiring her to be completely naked throughout the entire shower process, and mandating complete nudity while retrieving her own clothing prior to release, lacks any reasonable connection to a legitimate governmental objective. These policies and actions seem to be arbitrary,

64

purposeless, and devoid of any justifiable basis. Such requirements and practices infringe upon Doe's dignity, privacy, and personal autonomy without any apparent justification. See *Fisher v. Washington Metro. Area Transit Auth.*, 690 F.2d 1133, 1142 (4th Cir. 1982) (assessing under the Fourteenth Amendment a pretrial detainee's claim of unwarranted forced nudity), abrogated on other grounds by *Cty. Of Riverside v. McLaughlin*, 500 U.S. 44, 50 (1991); see also *Colbruno v. Kessler*, 928 F.3d 1156, 1164-66 (10th Cir. 2019) (finding officers obviously violated individual's due-process rights by requiring pretrial detainee to walk naked through hospital and denying qualified immunity even in absence of factually similar case).

Any reasonable adult in our society would understand that the involuntary exposure of an adult's nude body is a significant imposition on the victim. In *Shroff v. Spellman*, 604 F.3d 1179, 1184 (10th Cir. 2010), the plaintiff had been placed in a holding cell after her arrest, awaiting transfer to the city jail. She told the arresting officer that she needed to pump breastmilk to be used by her infant child in her absence. *Id*. He required her to do so under the observation of a female cadet, even though she could have been afforded privacy in a room with a guard outside. *Id*. at 1191. The court held that the officer had violated the Fourth Amendment, because he had "not demonstrated any justification for requiring [the plaintiff] to expose her breasts to a female cadet while she performed an essential bodily function in providing milk for her baby." *Id*. Several other circuits have

recognized that officials can violate the Eighth Amendment by forcing inmates to expose their naked bodies for the purpose of humiliation. See *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003); *Kent v. Johnson*, 821 F.2d 1220, 1227–28 (6th Cir. 1987); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981).

Deprivation of Sleep for Four Consecutive Nights Due to Constant Extremely Loud Toilet Flushing And 24-Hour Over The Bed Light Amounts to Punishment

Adults should stay awake no longer than 17 hours to meet the CDC's sleep recommendation. See https://www.medicalnewstoday.com/articles/324799#72-hours-without-sleep. People tend to experience the adverse effects of sleep deprivation within 24 hours. *Id*. One night of sleep loss is enough to disrupt day-to-day mental and physical well-being. See

https://www.cnn.com/2021/07/09/health/sleep-loss-harms-wellbeing-wellness/index.html.

*Jones v. Neven*, 678 F. App'x 490, 493 (9th Cir. 2017) and *Chappell v. Mandeville*, 706 F.3d 1052 (9th Cir. 2013), relying by the district court, are easily distinguishable. ECF 163 at 59-60. They applied the more demanding Eighth Amendment deliberate-indifference standard, as opposed to the objective inquiry that should be applied here.

In the context of incarceration or any custodial setting, the denial or

disruption of sleep can be particularly distressing and detrimental. It may further exacerbate the already challenging and stressful conditions of confinement, impede an individual's ability to function effectively, and compromise their overall well-being. The loss of sleep for four consecutive nights can have a cumulative effect, intensifying the adverse consequences on an individual's physical, mental, and emotional state. See *Hardeman v. Curran*, 933 F.3d 816, 820-824 (7th Cir. 2019) (regardless of the legitimacy of replacement of a water booster pump, finding that a non-total deprivation caused by a three-day planned water shutdown objectively unreasonable and "excessive in relation to" any legitimate non-punitive purpose.)

Defendants failed to provide any rationale for their decision to utilize industrial-style toilets instead of residential-style toilets, despite the fact that industrial-style toilets generate excessive flushing noise, especially during inmates' sleep. See *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir. 1988) (infliction of incessant noise, even if it causes only agony and not enduring injury, may be a due process violation.)

The 24-hour toilet flushing noise and 24-hour over the bed lighting are objectively unreasonable and "excessive in relation to" any legitimate non-punitive purpose.

<u>24-Hour Lock Up Without Meaningful Recreation Amounts to Punishment</u>

Locking up Doe for 24 hours a day without providing meaningful recreation or access to natural light is excessive and devoid of any reasonable justification. 24-hour lock-up exacerbates the already oppressive conditions of the absence of windows and natural light in a cell.

<u>Forcing Doe to Purchase Hygienic Supplies Amounts to Punishment</u>

The requirement for pretrial detainees to purchase their own hygienic supplies lacks a rational relationship to any legitimate governmental objective. The provision of basic hygiene items is a reasonable and necessary responsibility of a correctional facility to ensure the health, well-being, and dignity of individuals in custody. The district court speculated that Doe purposely did not shower for her remaining time at the Jail therefore it seems highly likely that she would have not needed shampoo while Doe could have shampooed her hair in the sink without taking a shower. ECF 163 at 27. The record does not show Doe was informed she could have received free hygienic supplies or Doe purposely did not brush her teeth. Instead, Doe was informed to purchase hygienic items once the first set was run out.

## VII. NEITHER THE COUNTY NOR THE INDIVIDUAL DEFENDANTS ARE IMMUNE FROM STATE LAW TORT CLAIMS

Government Code §844.6(a)(2) expressly applies only to public entities, not public employees, as the statute states that "[n]othing in this section exonerates a

public employee from liability for injury proximately caused by his negligent or wrongful act or omission." Gov. Code, § 844.6, subd. (d). Also, in contrast with *Monell* liability, California law allows for vicarious liability of a municipality whose employee violates the statute when acting within the scope of employment. See Cal. Gov't Code § 815.2. See *C.A v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 868, 138 Cal.Rptr.3d 1, 270 P.3d 699 (holding that the general rules are (1) an employee of a public entity is liable for his or her torts to the same extent as a private person and (2) the public entity is vicariously liable for any injury which its employee causes to the same extent as a private employer.) Therefore, neither the County nor the individual defendants are immune. In addition, concluding that Doe's claim 15 is limited to the result of August 11, 2019 midnight search is a plain error.

Behavior may be considered outrageous if a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress. *Wallis v. Superior Court*, 160 Cal.App.3d 1109, 1120 207 Cal.Rptr. 123 (1984).

Doe's evidence raises genuine issues of material fact as to whether individual defendants abused their position of power to damage Doe's interests

would humiliate and degrade her. See *Huber v. Standard Ins. Co*., 841 F.2d 980, 987 (9th Cir. 1988) (holding that abusing position of power to damage the plaintiff's interests raises genuine issues of material fact as to intentional infliction of emotional distress); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1100 (9th Cir. 2013) (holding that a plaintiff was not required to show any particular susceptibility, the district court improperly resolved a fact question, and whether the incident was "extreme and outrageous" was for a factfinder to determine.)

## VIII.  DOE IS ENTITLED TO ALL WITNESS CONTACT INFORMATION AND THE DISTRICT COURT'S DENIAL IS A PLAIN ERROR

Doe suffered undue prejudice when the district court denied her motion to compel the disclosure of out-of-custody witnesses contact information while simultaneously faulting her for not providing declaration from any other inmates during the summary judgment stage. ECF 163 at 29, n. 21. This situation created a significant disadvantage for Doe and undermined her ability to present a complete and compelling case.

To begin, it is essential to acknowledge that the vast majority of individuals who were pretrial detainees and incarcerated with Doe during the relevant time frame have already been released. The district court's decision to grant Doe's motion to compel in relation to **only individuals who remained in custody** failed to consider the reality and the restrictions within correctional facilities can be

significant obstacles. ECF 71. Doe had no way to know whether or not those individuals in custody received her mails sent to jail and no one has ever responded to Doe's mails.

By denying Doe's motion to compel, the court effectively hindered her access to crucial witness information that could have been vital to her claims. Witness contact information is essential for effective case preparation, allowing parties to gather evidence, locate and interview witnesses, and potentially present testimony or affidavits in support of their positions. Denying Doe access to this information placed her at a distinct disadvantage and impeded her ability to fully investigate the facts of the case. Such denial constitutes a plain error.

Moreover, faulting Doe for not providing the witness's declaration during the summary judgment stage further compounded the prejudice she faced. By faulting Doe for not providing the witness's declaration, the district court essentially penalized her for a lack of evidence that she was unable to obtain due to the court's own denial of witness contact information.

This combination of denying Doe's motion to compel and faulting Doe for not presenting the witness's declaration restricted Doe's ability to access relevant evidence and effectively present her case, placing her at a distinct disadvantage compared to the opposing party.

The conflict between the right to discovery and the right to privacy was

addressed in *Puerto v. Superior Court* (2008) 158 Cal.App.4th 1242 [70

Cal.Rptr.3d 701]. Our discovery system is founded on the understanding that

parties use discovery to obtain names and contact information for possible

witnesses as the starting point for further investigations. . . ." *Id.* at 1249-1250.

While contact information generally is considered private, this "does not mean that

the individuals would not want it disclosed under these circumstances." *Id.* at

1252-1253. See also *Crab Addison v. Superior Court*, 169 Cal. App. 4th 958, 964,

975 (2008) (upholding trial court's order compelling putative class members'

contact information, including phone numbers.)

Courts have consistently recognized that witness contact information is

central to the adversarial system and that any privacy concerns can be adequately

addressed through protective orders, confidentiality agreements, or redaction of

sensitive personal information. Denying Doe access to the contact information of

potential witnesses may result in a violation of her constitutional rights, including

the right to a fair trial and access to evidence.

## CONCLUSION

For the foregoing reasons, Appellant respectfully requests that this Court

reverse the District Court's judgment and remand for further proceedings.

Date: June 21, 2023

*/s / JANE DOE*
Plaintiff-Appellant in Pro Per

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Appellant is aware of the following related case:

*Doe v. USDC-CASA*  No. 22-70056

Dated: June 21, 2023                    Respectfully submitted,

/s /  *JANE DOE*
Plaintiff-Appellant in Pro Per

## CERTIFICATE OF COMPLIANCE

This brief complies with the typeface requirements of FRAP 32(a)(5) and

the type-volume and style requirements of FRAP 32(a)(6) because it has been

prepared using a proportionally spaced typeface, 14-point Times New Roman, in

Microsoft Word 2010 and contains 15,998 words, including footnotes and

headings, according to the word count provided by Microsoft Word.


Dated: June 21, 2023                    Respectfully submitted,


                                        /s / *JANE DOE*
                                        Plaintiff-Appellant in Pro Per

## CERTIFICATE OF SERVICE

I certify that on June 21, 2023, I electronically filed the foregoing. I certify that the participants in this case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system. Non-participants will be served by U.S. mail.


Dated: June 21, 2023                Respectfully submitted,


/s / *JANE DOE*
Plaintiff-Appellant in Pro Per

# ADDENDUM

## I. PRIMARY CONSTITUTIONAL AND STATUTORY PROVISIONS

**U.S. Const. amend. XIV, §1.**
All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. 14th Amendment Section 1.

**42 U.S.C. 1983. Civil action for deprivation of rights**
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**Cal. Penal Code §4030(c)(3). "Strip Search" defined**
"Strip search" means a search which requires a person to remove or arrange some or all of his or her clothing so as to permit **a visual inspection of the underclothing**, breasts, buttocks, or genitalia of such person.

**Cal. Penal Code §4030(e). Strip search authorization**
A strip search or visual body cavity search, or both, shall not be conducted without the prior written authorization of the supervising officer on duty. The authorization shall include the specific and articulable facts and circumstances upon which the reasonable suspicion determination was made by the supervisor.

**Cal. Penal Code §4030(l). Privacy afforded to strip search**

All strip, visual, and physical body cavity searches shall be conducted in an area of privacy so that the search cannot be observed by persons not participating in the search. Persons are considered to be participating in the search if their official duties relative to search procedure require them to be present at the time the search is conducted.

# APPENDIX

 **Gmail**

**Jane Doe <courtproceeding9@gmail.com>**

## Jane Doe v. County of Orange (8:20-cv-00322-JHW-GJS) (CCMS 22348) - Status Update re 3/10 Motion to Compel

**Mariah A. Witt** <MWitt@ccmslaw.com>                                                              Mon, Apr 5, 2021 at 3:38 PM
To: Jane Doe <courtproceeding9@gmail.com>, GJSChambers <GJS_Chambers@cacd.uscourts.gov>
Cc: "Michael L. Wroniak" <mwroniak@ccmslaw.com>, "Mariah G. Stephens" <MStephens@ccmslaw.com>, Patrice Porter
<pporter@ccmslaw.com>

Doe,

We will determine next steps at the conference on Thursday per the advice and guidance of the Court.

Mariah

---

**From:** Jane Doe <courtproceeding9@gmail.com>
**Sent:** Monday, April 5, 2021 3:21 PM
**To:** GJSChambers <GJS_Chambers@cacd.uscourts.gov>
**Cc:** Mariah A. Witt <MWitt@ccmslaw.com>; Michael L. Wroniak <mwroniak@ccmslaw.com>; Mariah G. Stephens
<MStephens@ccmslaw.com>; Patrice Porter <pporter@ccmslaw.com>
**Subject:** Re: Jane Doe v. County of Orange (8:20-cv-00322-JHW-GJS) (CCMS 22348) - Status Update re 3/10 Motion to Compel

Ms Witt,

Thank you for the information. I performed a search and found out that out of nine names that you provided two people are out of
custody already, see attached. From the booking information of the remaining seven women, it seems like at some point between 2019
and 2020 they were released and now arrested for new charges. By the time my mail arrives at jail it is not sure if they are still there.
And even after they receive my mail it is not sure if they are able to respond to my mail.

Regards,
Doe

On Mon, Apr 5, 2021 at 2:50 PM GJSChambers <GJS_Chambers@cacd.uscourts.gov> wrote:

The Court will discuss this issue along with the pre-discovery motion issues on 4/8.

---

**From:** Mariah A. Witt <MWitt@ccmslaw.com>
**Sent:** Monday, April 5, 2021 1:53 PM
**To:** Jane Doe <courtproceeding9@gmail.com>
**Cc:** GJSChambers <GJS_Chambers@cacd.uscourts.gov>; Michael L. Wroniak <mwroniak@ccmslaw.com>; Mariah G. Stephens
<MStephens@ccmslaw.com>; Patrice Porter <pporter@ccmslaw.com>
**Subject:** RE: Jane Doe v. County of Orange (8:20-cv-00322-JHW-GJS) (CCMS 22348) - Status Update re 3/10 Motion to Compel

**CAUTION - EXTERNAL:**

Doe,

We were waiting on the follow-up call with the Court and Judge Standish to determine next steps with the contact information. However, in the interterm, here are the names of the persons that are still in custody. The remainder of the persons who were in Module G, Tank 2 with you have been released.

- Jasmin Mendoza
- Jasmin Rangel
- Alexa McConnell
- Jacklyn Jacome
- Anglique Outhuyse
- Nicole Kaefer
- Felicia Wornstaff-Johnson
- Santa Quinones
- Toetu Lavea

They can all be contacted via regular mail through the OCSD department. We will wait to the follow-up call with Judge Standish regarding the contact information of other persons.

As for the drawing of the jail, it was supposed to be completed on 3/31 and we have followed up regarding the status of the drawing. We will provide it to you as soon as we receive it from the County.

Mariah

---

**From:** Jane Doe <courtproceeding9@gmail.com>
**Sent:** Monday, April 5, 2021 10:17 AM
**To:** Mariah A. Witt <MWitt@ccmslaw.com>
**Cc:** GJS_Chambers@cacd.uscourts.gov; Michael L. Wroniak <mwroniak@ccmslaw.com>; Mariah G. Stephens <MStephens@ccmslaw.com>; Patrice Porter <pporter@ccmslaw.com>
**Subject:** Re: Jane Doe v. County of Orange (8:20-cv-00322-JHW-GJS) (CCMS 22348) - Status Update re 3/10 Motion to Compel

Dear Ms Witt,

Thank you for the update. I propounded discovery of witnesses' contact information on Oct 5, 2020 and it has been six months. It has been almost a month since our previous discovery hearing. By far I have not received any information regarding who is still in custody. Nor did I receive the drawing of the holding tank. If anyone is still in custody how can I contact them? If no one is in custody what would be the solution? The withholding of contact information of witnesses substantially hamper the prosecution of this case.

Regards,

Doe

On Wed, Mar 24, 2021 at 8:50 AM Mariah A. Witt <MWitt@ccmslaw.com> wrote:

Judge Standish and her honorable chambers,

Pursuant to the Motion to Compel hearing that went forward on 3/10/2021 in this matter and the subsequent ruling on that hearing, the County of Orange herein provides the requested status update. Plaintiff had not initiated a meet and confer with us regarding any names that she recognizes from the list of person housed in Module G, Tank 2 or whether she has completed that review. We followed up with Jane Doe about this on Tuesday 3/23 and she stated that once she had the layout of Tank 2, she may be able to identify some persons based on their bunk location. So once we have provided that to her, we will determine if persons are identified and will promptly gather and compile the contact information of those witnesses. Additionally, we have requested the information regarding the persons still in custody as of today's date that were housed at the same time of Plaintiff. We have yet to receive that information but are in the process of gathering and compiling that data to determine next steps. Once we have this information, we will advise the Court of the quantity of such information and whether we should proceed with getting their contact information.

As for the drawing of Module G, Tank 2, the Crime Lab sketch artist of the County of Orange will be completing the drawing on Wednesday, March 31st. There has been delay in completing this because it requires the entire Module to be emptied, cleared, and allow third parties to come in. The measurements previously provided to Plaintiff will also be included in that sketch. We will provide that to Plaintiff once we have received the drawing/sketch.

Please let us know if the Court has any other questions.

Thanks,

**Mariah Witt**

Attorney at Law

**T**: 714-823-4100 **C:** 714-767-5773
**F**: 714-823-4101
750 The City Drive, Suite 400
Orange, CA 92868
mwitt@ccmslaw.com

**COLLINS COLLINS**
**MUIR + STEWART** LLP

www.ccmslaw.com

South Pasadena 626-243-1100 - Orange 714-823-4100 - San Diego 760-274-2110
Oakland 510-844-5100 - Inland Empire 909-581-6100

PLEASE NOTE: The information contained in this e-mail transmission is intended to be sent only to the stated recipient of the e-mail. If the reader of this message is not the intended recipient or the intended recipient's agent, you are hereby notified that we do not intend to waive any privilege that might ordinarily attach to this communication and that any dissemination, distribution, or copying of the information contained in this e-mail is therefore prohibited. You are further asked to notify us of any such error in transmission as soon as possible at the telephone number shown below and to delete the e-mail. Thank you for your cooperation.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.