**No. 23-55258**

_____

IN THE

# United States Court of Appeals

**For the Ninth Circuit**

_____

JANE DOE,
Plaintiff/Appellant,

vs.

COUNTY OF ORANGE, *et al.*,
Defendants/Appellees.


ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
JOHN W. HOLCOMB, U.S. DISTRICT COURT JUDGE
U.S.D.C. No. 8:20-cv-00322-JWH-GJS

_____

**APPELLEES' ANSWERING BRIEF**

_____

Michael L. Wroniak, Esq.
David C. Moore, Esq.*
Rebecca J. Chmura, Esq.* COLLINS + COLLINS LLP
790 E. Colorado Boulevard, Suite 600
Pasadena, CA 91101
(626) 243-1100 – Fax: (626) 243-1111
dmoore@ccllp.law
mwroniak@ccllp.law
rchmura@ccllp.law
Attorneys for Defendants/Appellees, Defendants County of Orange, Don Barnes,
William Baker, Joe Balicki, Mark Stichter, Reyna Rivera, Devonna Falconer,
Kassandra Mayer, Elia Rodriguez, and Rachel Addington

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Don Barnes, William Baker, Joe Balicki, Mark Stichter, Reyna Rivera, Devonna Falconer, Kassandra Mayer, Elia Rodriguez, and Rachel Addington are individuals, and the County of Orange is a public entity.

DATED:  Nov. 29, 2023                    COLLINS + COLLINS LLP


By: _____
      DAVID C. MOORE
      MICHAEL L. WRONIAK
      REBECCA J. CHMURA
      Attorneys for Defendants/Appellees
      COUNTY OF ORANGE; DON
      BARNES; WILLIAM BAKER; JOE
      BALICKI; MARK STICHTER;
      REYNA RIVERA; DEVONNA
      FALCONER; KASSANDRA MAYER;
      ELIA RODRIGUEZ; RACHEL
      ADDINGTON

i

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**……………………………………………………………..1

**STATEMENT OF JURISDICTION**…………………………………………2

**STATEMENT OF THE CASE**………………………………………..……..2

**I.    FACTUAL BACKGROUND**………………………………………...2

　　A.    Doe is Arrested and Booked in the WCJ……………………………..2

　　B.    Doe is Body-Searched After Being Placed in the Jail's General
　　　　Population………………………………………………………..…..4

　　C.    The "FAST" Search……………………………………………...…..6

　　D.    WCJ Meal Policies………………………………………..…………7

　　E.    WCJ Climate Control………………………………………..………7

　　F.    The Modules and Inmate Recreation in the WCJ……………..…....8

　　G.    Doe is Released from the WCJ…………………………………..…..9

**II.    PROCEDURAL HISTORY**...…………………………..…….…..9

**STANDARD OF REVIEW**………………………………….…………..13

**ARGUMENT**………………………………………………………………14

**I.    THE DISTRICT COURT'S SUMMARY ADJUDICATION OF DOE'S**
**FIRST CLAIM WAS CORRECT**……………………………………..15

　　A.    Doe Fails to Demonstrate how her Deposition Testimony and Sworn
　　　　Declarations were Supposedly Consistent…………………..……….15

　　B.    Appellees Carried Their Initial Burden of Showing No Substantial
　　　　Risk of Serious Harm, and Doe's Evidence Failed to Raise A Genuine
　　　　Issue of Material Fact…………………………………………..……16

II. THE DISTRICT COURT APPLIED THE CORRECT STANDARDS FOR PRETRIAL DETAINEES UNDER THE FOURTEENTH AMENDMENT……………………….…………………………………...27

III. THE SEARCHES DID NOT VIOLATE DOE'S RIGHTS……………..28

    A. WCJ Policies Regarding Searches…………………………………..28

    B. California Penal Code Section 4030 is Inapplicable Because the Searches Occurred After Doe was Placed in General Population…………29

    C. The Body Searches Were Constitutionally-Permissible…………….31

        i. The scope of the intrusion was reasonable…………………..33

        ii. The manner in which the searches were conducted was reasonable…………………………………………………...36

        iii. The searches were justified………………………………37

        iv. The searches were performed in reasonable places…………40

    D. The FAST Search was Constitutionally Permissible………………41

        i. The FAST search did not violate the Fourth Amendment…...41

        ii. The FAST search did not violate the First Amendment……...43

IV. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT AS TO THE *MONELL* CLAIMS……………………………....43

    A. The WCJ's Search Policy is Not Unconstitutional………………….43

    B. No Constitutional Violations or Injury Regarding the Shower or Changing in a Non-Private Area…………………………………….…44

    C. No Unconstitutional Overcrowding…………………………...…45

    D. The Temperature of WCJ does not Amount to a Constitutional Violation…………………………………………………………….45

    E. Doe has Not Shown any Policies or Conduct that Amounted to Punishment…………………………………………………………46

    F. Doe did Not Put the Jail's Recreation Policies at Issue in this

Matter……………………………………………………………..46

G.  Nothing in Doe's Brief changes the finding that the Lighting in the Jail was not Unconstitutional……………………………..……….........47

H.  WCJ Inmates are Provided with Constitutionally Satisfactory Hygienic Products……………………………………………………..…47

**V.  DOE WAS NOT SUBJECTED TO PUNISHMENT**…………………..48

A.  One Missed Meal and Denial of a Blanket Did Not Constitute Punishment…………………………………………………....49

B.  Alleged "Forced Nudity" in Connection with Mandatory Shower and Retrieval of Clothing Was Not Punishment………………..…......51

C.  Purported Sleep Deprivation Was Not Punishment………………..52

D.  Alleged 24-Hour Lockup Was Not Punishment……………………54

E.  Allowing the Purchase of Additional Hygienic Supplies Was Not Punishment…………………………………………………..54

**VI.  THE DISTRICT COURT PROPERLY ADJUDICATED DOE'S STATE LAW CLAIMS**………………..………………………………..58

**VII.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN RULING ON DOE'S MOTION TO COMPEL**………………………………60

A.  Doe Was Provided Names of Overlapping Inmates Still in Custody………………………………………………………...60

B.  The District Court Properly Denied Doe's Motion as to Pretrial Detainees No Longer In Custody…………………………………....61

**CONCLUSION**………………………………………………………....63

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*American Federation of Musicians of United States & Canada v. Paramount Pictures Corp.*,
903 F.3d 968 (9th Cir. 2018) ...............................................................13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................18, 20, 21, 23

*Antonelli v. Sheahan*,
81 F.3d 1422 (7th Cir. 1996) .............................................................53

*Associated Press v. U.S. Dept. of Defense*,
554 F.3d 274 (2d Cir. 2009) ...............................................................61

*Bates v. City of Little Rock*,
361 U. S. 516, 80 S.Ct. 412 (1960).......................................................45

*Bell v. Wolfish*,
441 U.S. 520, 99 S.Ct. 1861 (1979)..............................................*passim*

*Bias v. Moynihan*,
508 F.3d 1212 (9th Cir. 2007) ...........................................................14

*Birchfield v. North Dakota*,
579 U.S. 438, 136 S.Ct. 2160 (2016)....................................................37

*Block v. Rutherford*,
468 U.S. 576, 104 S.Ct. 3227 (1984)......................................39, 41, 43

*Boyd v. City & County of San Francisco*,
576 F.3d 938 (9th Cir. 2009) ................................................14, 61, 62

*Brown v. Polk County, Wisconsin*,
_____ U.S. _____, 141 S. Ct. 1304, 209 L.Ed.2d (2021) ................................37

*Bull v. City and County of San Francisco*,
595 F.3d 964 (9th Cir. 2010) .............................................................33

*Burns v. Goodman*,
  2001 WL 498231 (N.D. Tex. May 8, 2001), aff'd, 31 F. App'x 835
  (5th Cir. 2002)...................................................................................54

*Byrd v. Maricopa County Bd. of Supervisors*,
  845 F.3d 919 (9th Cir. 2017) ............................................................34

*Byrd v. Maricopa County Sheriff's Dept.*,
  629 F.3d 1135 (9th Cir. 2011) ..........................................................32

*Calhoun v. Detella*,
  319 F.3d 936 (7th Cir. 2003) ............................................................55

*Chappell v. Mandeville*,
  706 F.3d 1052 (9th Cir. 2013) ..........................................................56

*Colbruno v. Kessler*,
  928 F.3d 1155 (10th Cir. 2019) ........................................................53

*County of Los Angeles v. Los Angeles County Employee Relations
  Com.*,
  56 Cal.4th 905, 157 Cal.Rptr.3d 481, 301 P.3d 1102 (2013) ...........61

*Crab Addison, Inc. v. Superior Court*,
  169 Cal.App.4th 958, 87 Cal.Rptr.3d 400 (2008) ............................62

*Cunningham v. Multnomah County*,
  737 Fed. Appx. 814 (9th Cir. 2018)...................................................40

*Data Disc, Inc. v. Systems Technology Assocs., Inc.*,
  557 F.2d 1280 (9th Cir. 1977) ..........................................................14

*Dearman v. Woodson*,
  429 F.2d 1288 (10th Cir. 1970) ........................................................52

*Doan v. Watson*,
  168 F. Supp. 2d 932 (S.D. Ind. 2001).................................................53

*Doe v. Kelly*,
  878 F.3d 710 (9th Cir. 2017) ............................................................51

*Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002) ............................................................13

*Eisenberg v. Insurance Co. of N. Amer.*,
815 F.2d 1285 (9th Cir. 1987) ............................................................27

*Fisher v. Washington Metro. Area Transit Auth.*,
690 F.2d 1133 (4th Cir. 1982) ............................................................54

*Florence v. Board of Chosen Freeholders of the County of Burlington*,
566 U.S. 318, 132 S.Ct. 1510 (2012)..............................................*passim*

*Foster v. Arcata Assoc.*,
772 F.2d 1453 (9th Cir.1985), *cert. denied*, 475 U.S. 1048, 106
S.Ct. 1267, *overruled on other grounds by Kennedy v. Allied Mut.*
*Ins. Co.*, 952 F.2d 262 (9th Cir. 1991)................................................24

*Foster v. Runnels*,
554 F.3d 807 (9th Cir. 2009) ..............................................................52

*FTC v. Publishing Clearing House, Inc.*,
104 F.3d 1168 (9th Cir. 1997) ............................................................19

*Gordon v. County of Orange*,
888 F.3d 1118 (9th Cir. 2018.) ...........................................................17

*Gray v. Hardy*,
826 F.3d 1000 (7th Cir. 2016) ............................................................50

*Grummett v. Rushen*,
779 F.2d 491 (9th Cir. 1985) ..............................................................34

*Hallett v. Morgan*,
296 F.3d 732 (9th Cir. 2002) ..............................................................14

*Hudson v. Palmer*,
468 U.S. 517. 104 S.Ct. 3194 .............................................................41

*Hughes v. Pair*,
46 Cal.4th 1035 (2009) .......................................................................60

*Jackson v. City of Bremerton*,
268 F.3d 646 (9th Cir. 2001) .........................................................45, 46

*Jones v. Neven*,
678 F. App'x 490 (9th Cir. 2017)........................................................56

*Keenan v. Hall*,
  83 F.3d 1083 (9th Cir. 1996) ........................................................17, 52

*Kent v. Johnson*,
  821 F.2d 1220 (6th Cir. 1987) ............................................55

*Kirkpatrick v. City of Los Angeles*,
  803 F.2d 485 (9th Cir. 1986) ............................................37

*Kusper v. Pontikes*,
  414 U. S. 51, 94 S.Ct. 303 (1973)........................................45

*Lee v. Downs*,
  641 F.2d 1117 (4th Cir. 1981) ............................................55

*Leer v. Murphy*,
  844 F.2d 628 (9th Cir. 1988) ............................................16

*Leslie v. Grupo ICA*,
  198 F.3d 1152 (9th Cir.1999) ........................................23, 24

*Litmon v. Santa Clara County*,
  2009 WL 890884 (N.D. Cal., March 31, 2009).........................35

*Lowry v. City of San Diego*,
  858 F.3d 1248 (9th Cir. 2017) ............................................25

*Medina v. Morris*,
  2014 WL 12686744 (S.D. Cal. June 2, 2014) .......................47

*Michenfelder v. Sumner*,
  860 F.2d 328 (9th Cir. 1988) ............................................32

*Nigro v. Sears, Roebuck & Co.*,
  784 F.3d 495 (9th Cir. 2015) ............................................26

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
  210 F.3d 1099 (9th Cir. 2000.) ............................................19

*O.L. v. Jara*,
  2022 Westlaw 1499656 (9th Cir. May 12, 2022) .................1

*People v. [Redacted]*,
2022 Westlaw 1548493 (Sup. Ct. App. Div., April 27, 2022) ............................ 1

*Pina v. County of Los Angeles*,
2020 WL 13588159 (C.D. Cal., Jan. 2, 2020) .................................................. 58

*Puerto v. Superior Court*,
158 Cal.App.4th 1242, 70 Cal.Rptr.3d 701 (2008) ........................................... 62

*Rhodes v. Chapman*,
452 U.S. 337, 101 S.Ct. 2392 (1981) .......................................................... 17, 55

*Richerson v. Lexington Fayette Urban County Gov't*,
958 F.Supp. 299 (E.D. Ky. 1996) ................................................................... 32

*Rickman v. Avaniti*,
854 F.2d 327 (9th Cir. 1988) .......................................................................... 32

*Rivera v. National R.R. Passenger Corp.*,
331 F.3d 1074 (9th Cir. 2003) ........................................................................ 19

*Robins v. Centinela State Prison*,
19 Fed.Appx. 549 (9th Cir. 2001) ......................................................... 22, 23, 41

*Roman v. Wolf*,
977 F.3d 935 (9th Cir. 2020) .......................................................................... 17

*Ruiz v. Snohomish County*,
2019 WL 11894363 (W.D. Wash., Sept. 5, 2019) ............................................ 43

*Sandoval v. County of Sonoma*,
912 F.3d 509 (9th Cir. 2018) .......................................................................... 13

*Securities and Exch. Comm. v. Phan*,
500 F.3d 895 (9th Cir. 2007) .......................................................................... 26

*Sepulveda v. Ramirez*,
967 F.2d 1413 (9th Cir. 1992) ........................................................................ 35

*Shapiro v. Thompson*,
394 U. S. 618, 89 S.Ct. 1322 (1969) .............................................................. 45

*Shroff v. Spellman*,
604 F.3d 1179 (10th Cir. 2010) ..........................................................54

*Thompson v. Souza*,
111 F.3d 694 (9th Cir. 1997) ..............................................................40

*Tuffly v. U.S. Dept. of Homeland Security*,
870 F.3d 1086 (9th Cir. 2017) ............................................................61

*United States v. Cohen*,
796 F.2d 20 (2d Cir. 1986) .................................................................45

*Vasquez v. County of Kern*,
949 F.3d 1153 (9th Cir. 2020) ............................................................35

*Walker v. Woodford*,
454 F. Supp. 2d 1007 (S.D. Cal. 2006) ..............................................50

*Whittington v. California Dep't of Corrections & Rehabilitation*,
2010 WL 761314 (N.D. Cal., March 3, 2010) ....................................35

*Woods v. Thieret*,
903 F.2d 1080 (7th Cir. 1980) ............................................................52

*Wright v. State of California*,
122 Cal.App.4th 659, 19 Cal.Rptr.3d 92 (2004) ...............................58

*Yourke v. City & County of San Francisco*,
2010 WL 3701789 (N.D. Cal., Sept. 16, 2010) ................................30

**Constitutions**

First Amendment ...................................................................................10, 43

Fourth Amendment ...............................................................................*passim*

Eighth Amendment ...............................................................................28, 54

Fourteenth Amendment ........................................................................*passim*

California Constitution Article 1, § 1 ...................................................11, 28

California Constitution Article 1, § 2 ...................................................11

California Constitution Article 1, § 7 ........................................................11

California Constitution Article 1, § 13 ..............................................11, 28

**Statutes**

28 United States Code § 1291 ......................................................................2

42 United States Code § 1983 ....................................................................11

Cal. Pen. Code § 4030(e) ...........................................................................30

California Penal Code § 4030 .............................................................*passim*

Government Code § 815.2(b) ......................................................................59

Government Code § 820.2 ...........................................................................59

Government Code § 820.8 ...........................................................................59

Government Code § 844.6(a)(2) ..................................................................58

**Court Rules**

F. R. App. Proc. 28(a)(8)(A)................................................................16, 28

F. R. App. P. 32(a)(5)..................................................................................64

F. R. App. P. 32(a)(6)..................................................................................64

F. R. Civ. P. 56(a) .......................................................................................18

Federal Rule of Appellate Procedure 28(a)(3)...........................................22

Ninth Cir. R. 28-1(a) ..................................................................................22

Ninth Cir. R. 36-3(a) ..................................................................................22

Ninth Cir. R. 36-3(c) ..................................................................................41

Ninth Cir. R. 36-3 .......................................................................................41

## INTRODUCTION

Plaintiff Jane Doe (a.k.a "O.L.") ("Doe") is a serial litigant who targets public entities and other defendants throughout California and in Colorado with meritless lawsuits. This case is just another example of her litigiousness.[1] On this occasion she has targeted the County of Orange ("County"), and several of its employees (collectively "Appellees") in connection with her short, four-day incarceration at the Orange County Women's Central Jail ("WCJ"). Doe complains of alleged "unconstitutional" conditions, claiming the jail was cold, she was allegedly denied food, she was "strip-searched" unnecessarily, her cell was searched unnecessarily, and she was denied menstrual and hygiene products.

Despite what she would like this Court to believe, Doe is no victim in this case. The reason she was in the WCJ was because she had been arrested for vandalizing an ex-boyfriend's residence and disobeying a domestic violence court order. Her misconduct resulted in criminal misdemeanor charges for vandalism, her disobedience of the domestic violence court order, and public posting of private and personal photographs of the ex-boyfriend ("revenge porn"). See *People v. [Redacted]*, 2022 Westlaw 1548493, *1-2 (Sup. Ct. App. Div., April 27, 2022).[2] She

---

[1] This Court previously encountered Doe in *O.L. v. Jara,* 2022 Westlaw 1499656 (9th Cir. May 12, 2022).

[2] The case name is redacted out of respect for (if not compliance with) the district court order allowing the plaintiff to proceed pseudonymously in this matter.

was later found guilty by a jury of all three counts. *Id.* But instead of simply taking responsibility for her misdeeds, Doe then filed the present lawsuit in an apparent effort to retaliate against the County for having the temerity to arrest and jail her for her criminal conduct.

As detailed below, Doe's claims have no merit. The alleged jail conditions did not pose a substantial risk of harm and did not constitute "punishment." The searches Doe underwent were reasonable and within constitutional parameters. None of the actions taken with respect to Doe were intended as or constituted prohibited "punishment." And there is no basis for imposition of *Monell* liability because there were no underlying constitutional violations. This Court should affirm the judgment.

## STATEMENT OF JURISDICTION

The Court has jurisdiction pursuant to 28 United States Code section 1291.

## STATEMENT OF THE CASE

## I. FACTUAL BACKGROUND

### A. <u>Doe is Arrested and Booked in the WCJ</u>

After issuance of a warrant, Doe was arrested by Santa Ana police on August 8, 2019, and taken to the WCJ. Doe was booked into the WCJ at approximately 4:26 p.m. (4-SER-636, 723.) The booking process occurs on the first floor of the WCJ.

The WCJ is a County jail facility that houses both sentenced and pretrial

female inmates. The County has implemented policies at the WCJ and trains its employees who work there to avoid and prevent the violation of inmates' constitutional rights. At all relevant times, the WCJ had in place policies and procedures established in accordance with the Title 15 and Title 24 (Minimum Standards for Local Detention Facilities) of the California Code of Regulations to ensure that the policies of local detention facilities conform to applicable federal, state, and local laws concerning incarceration of inmates. (1-SER-16; 3-SER-540; 5-SER-845-859.) All staff members and deputies at the WCJ were (and continue to be) trained on constitutional rights and obligations pertaining to inmates in accordance with Title 15, WCJ policy, and other applicable standards. (6-SER-1063-1065, 1042, 1052-53, 1058-59, 1048-49, 1030-31.) During the booking process, Doe signed paperwork acknowledging that she received the Jail Rules. (4-SER-723.)

After the booking process, Doe was taken upstairs to the shower area where she showered, and changed into her jail uniform, which included a bra. (1-SER-12; 4-SER-624; 5-SER-801, 809.) Doe initially chose not to wear the bra because she believed it was dirty. (1-SER-12.)

Doe was then placed in a holding area with other inmates. Doe remained in the holding area for several hours before being escorted upstairs from the processing area along with other inmates.

3

**B.** **Doe is Body-Searched After Being Placed in the Jail's General Population**

Once upstairs, a deputy noticed Doe was not wearing a bra, so the deputy obtained a bra for her, and asked Doe to put it on. (4-SER-580.) After putting on the bra, Doe and the other inmates underwent a routine "Extended Correctional Search" or "body search." (4-SER-629, 634.) Because Doe was in her menstrual cycle, she was told to pull down her underwear and twist the menstrual pad in front of female jail deputy to expose the underwear beneath it and then place the pad back in place. (3-SER-254.) Doe admits that at no point during the search was she asked to remove her bra or underwear, her intimate areas were never touched, and the searches were observed and conducted by female deputies. (1-SER-38; 4-SER-581-584, 641-643, 647, 668-670, 673-74; 5-SER-730-31, 738-39.) Doe was also never fully naked during this search, the search occurred in a small group, and the search was not unique to or targeted specifically at her. (*Id.*) Doe also acknowledges that this initial search occurred after she had completed the booking process and was in (or destined for) general population. (4-SER-629 and 633.)

WCJ policy defines an Extended Correctional Search as one in which the inmate is required to remove all garments down to, but not including, the inmate's bra and panties. (5-SER-831-32.) Such a search allows deputies to examine an inmate's outer garments and visually inspect an inmate's undergarments. (*Id.*) WCJ

4

policy defines a "strip search" as something different -- a search that includes a visual inspection of an inmate's breasts, buttocks, or genitalia. (5-SER-833.) The objective of both types of searches is to detect, control, and prevent the intake and introduction of contraband into WCJ, and to preserve the security and safety of inmates and WCJ staff. (*See* 4-SER-589; 5-SER-831.) Jail policy prohibits deputies from using searches to punish, harass, or embarrass an inmate. (4-SER-601.)

Doe admits that her genital areas were never fully exposed or touched during any of the searches at issue in this case. (5-SER-738.) Moreover, none of the body searches involved a visual inspection of her breasts or buttocks. (*See* 4 SER-641-643, 647.) Consequently, none of the searches in question were "strip searches" as defined by WCJ policy.

Doe underwent six more Extended Correctional Searches during her time at the WCJ, all of which involved similar circumstances, *i.e.*, only female deputies were present, only female inmates were present, she was never fully naked, she kept her bra and underwear on, her genital region was never exposed or touched, and she was asked to lift and twist her menstrual pad so that a deputy could inspect underneath it and see that nothing was in the pad. (4-SER-581, 584, 641-643, 647, 668-670, 673-674, 677; 5-SER-730-31, 738-39; 3-SER-253-254.) Two of the subsequent six searches occurred on August 10, 2019 before and after Doe was allowed to access the outside roof/patio area. (AOB, 7.) The next three searches

occurred on August 12, 2019, before Doe went to court, after she arrived there, and after she returned, per WCJ policy. (*Id.*) The final search occurred on August 12, 2019, just before Doe was released. (*Id.*) Doe never complained about any of the searches. [4-SER-591-592, 670, 678, 708.]

Following her initial Extended Correctional Search, Doe was taken to Module G, Tank 2, a 1,000 square foot community cell. (6-SER-1032; 1-SER-14.) Tank 2 contained twenty bunkbeds, two showers, a bathroom, and a 360 sq. ft. dayroom. (*Id.*) She was given a mattress, sheets, blanket, towels, underwear, comb, toothbrush, toothpaste, soap, and a pad. (4-SER-649, 695-96; 5-SER-809, 819-20; 6-SER-1034.) There were approximately 40 inmates in the module. (5-SER-743; 6-SER-1032.)

## C.   The "FAST" Search

On August 11, 2019, at approximately 12:16 a.m., Deputy Appellees conducted a routine  Facility Assigned Search Team ("FAST") search of Module G, Tank 2. (1-SER-16; 4-SER-588; 699-700; 5-SER-743.) None of the other individual Appellees participated in the FAST search. (4-SER-598-99.)

During this FAST search, the Deputy Appellees entered the tank and instructed all of the inmates to stand up in full jail-issued clothing and file into the day room. (1-SER-16.) Each bunk and surrounding areas were checked for weapons,

contraband, or drugs. (*Id.*) The search revealed that three inmates had altered razors, and those inmates were subsequently written up for this major jail rule violation. (*Id.*) When the FAST search was completed, inmates were permitted to return to their respective bunks. (*Id.*) This FAST search did not target Doe specifically; rather, it was conducted as to Tank 2 in Module G in its entirety. (6-SER-1044, 1050, 1054, 1060.)

### D. **WCJ Meal Policies**

The WCJ's policy regarding food was (and continues to be) that inmates are given meals three times a day at 5:00 a.m. (breakfast); 11:00 a.m. (lunch); and 4:00 p.m. (dinner). (5-SER-840; 5-SER-1035.) Because the booking process in this instance occurred after 4:00 p.m., Doe was given a meal at the next mandated time, 5:00 a.m. the following day. (5-SER-774:20.) As discussed more fully below, Doe's claim that she was denied food is limited to allegedly being denied food in connection with one missed meal on the evening of August 8 and in response to requests during the intake/booking process. There is no claim she was denied food in connection with any of the other scheduled meals during her time at the WCJ. (4-SER-544, 546-47; 5-SER-774:20; 6-SER-884-885.)

### E. **WCJ Climate Control**

As detailed below, some of Doe's claims are predicated on her assertion that

the WCJ was "bone-chillingly" cold. However, her claims are limited to conditions on the first floor of the WCJ – the booking area, for the most part. (4-SER-547, 654; 6-SER-884.) In that regard, the WCJ has an air conditioning system and exhaust fans in the restrooms and common areas to move fresh conditioned air throughout the building. (6-SER-1031, 1038.) The system is monitored and controlled by a computerized system. (*Id.*) While the WCJ's temperature can vary somewhat depending on the particular

location within the jail and the time of day, the average computer-controlled temperature is 70 degrees Fahrenheit. (6-SER-1038.)

### F.     The Modules and Inmate Recreation in the WCJ

Doe was not confined to her cell 24 hours per day. (4-SER-666-667, 685; 5-SER-739; 8-SER-1436-37.) Inmates in the WCJ are offered an opportunity to have a minimum of three hours of outdoor recreation each week, which occurs outside on the WCJ patio. (1-SER-15; 5-SER-820; 6-SER-1032.) Inmates are free to exercise inside the module at their own discretion. Barring unforeseen circumstances or emergencies, dayrooms within modules are generally available for use from 6:00 a.m. to 11:00 p.m. every day. (1-SER-15; 6-SER-1032.)

Between the hours of lights out and the morning, all inmates are required to remain on their bunks quietly, except if they need to use toilets. (1-SER-15; 4-SER-

692-693; 5-SER-804; 6-SER-1032.)    In accordance with Title 24, low-wattage security lights remained on in the module during "lights out" time.  [4-SER-686; 5-SER-856-859; 6-SER-1032, 1043, 1049, 1053-54, 1059, 1065, 1069; 3-SER-540.) While Doe claims she was sleep-deprived while in the WCJ, she admits she was able to get at least some sleep, that her inability to fully sleep at the WCJ was due to being scared, and that she had sleep issues prior to being arrested.  [4-SER-651, 689, 691, 695; 6-SER-880-81, 1005, 1069-70; 3-SER-539.)

### G.    **Doe is Released from the WCJ**

On August 12, 2019, Doe was transported from the WCJ to the Orange County Superior Court in Santa Ana.  (AOB, 7.)  As noted above, Doe underwent routine Extended Correctional Searches before being transported to the court, after arrival at court, and upon returning to the WCJ.   At 3:28 p.m., the Superior Court issued a notice that Doe was to be released on her own recognizance.  After being transported back to WCJ, Doe was processed and released on that date.  (AOB, 7.)

All told, Doe spent approximately four days in the WCJ.  Notably, she never complained to any WCJ staff about the searches or WCJ's conditions while she was in custody. (4-SER-670, 685, 688.)

## II.    PROCEDURAL HISTORY

Doe filed this lawsuit on February 18, 2020. (8-SER-1473.)   Her pleading

named ten (10) defendants: the County of Orange; Don Barnes, the Sheriff of the Orange County Sheriff's Department ("OCSD"); William Baker, the Assistant Sheriff; Joe Balicki, the Commander in charge of custody operations; Mark Stichter, the Captain in charge of the WCJ; and Reyna Rivera, Devonna Falconer, Kassandra Mayer, Elia Rodriguez, and Rachel Addington, OCSD employees/deputies who were involved in the search of Doe's cell. The five individual deputy defendants are sometimes collectively referred to as the "Deputy Appellees."

Doe's pleading went through a series of amendments due to the Magistrate's screening process and the County's filing of two different motions to dismiss under Rule 12. Eventually, on December 1, 2020, Doe filed a Fourth Amended Complaint ("FAC"), which is the operative pleading in this matter. (8-SER-1429.) Appellees filed an answer on December 14, 2020. (9-SER-1513.)

The FAC asserts the following claims: (1) violation of the Fourteenth Amendment by "denial of life necessities;" (2) violation of the Fourteenth Amendment by overcrowding and sleep deprivation; (3) violation of the Fourth Amendment by strip searches (bodily privacy); (4) violation of the Fourth Amendment by a "harassing cell search;" (5) violation of the First Amendment by "harassing cell search" at midnight in retaliation for "Plaintiff and other inmates'

expression during the day; ($7^3$) municipal liability for unconstitutional custom or policy; (8) municipal liability for failure to train and supervise; (9) violation of article 1, section 7 of the California Constitution by denial of "life necessities;" (10) violation of article 1, section 7 of the California Constitution by overcrowding and sleep deprivation; (11) violation of article 1, section 13 of the California Constitution by illegal strip searches; (12) violation of article 1, section 13 of the California Constitution by "harassing cell search;" (13) violation of the freedom of expression component of article 1, section 2 of the California Constitution by conducting a midnight cell search in retaliation for "Plaintiff and other inmates' expression during the day;" (14) violation of rights of privacy under article 1, section 1 of the California Constitution; (15) negligent supervision, training, disciplining and retention of employees; (16) violation of California Penal Code section 4030; and (17) intentional infliction of emotional distress. (7-SER-1428, et seq.) The first seven claims are all predicated on 42 United States Code section 1983. The remaining claims are, as indicated, premised on state law.

In February, 2021, Doe moved to compel contact information for inmates who were held in the same holding tank between August 8 and 12, 2019. (AOB, 17.) Appellees opposed the motion. On March 10, 2021, the Magistrate Judge issued an

---

[3] There was no claim or cause of action in the FAC denominated as the sixth claim. (*See* 8-SER-1447-48.) It appears Doe inadvertently misnumbered her claims.

order granting Doe's motion in part. (1-SER-89.) The court ordered Appellees to gather information concerning overlapping inmates who remained in custody. The court also stated that it intended to set the case for a further conference to determine the level of detail and procedure required to provide Doe with "sufficient information to satisfy her need for relevant discovery in light of the significant privacy interests of third parties that are at stake." (*Id.*)

On April 8, 2021, the Magistrate Judge issued another order after conducting a telephone conference/hearing. The court reiterated that Doe's motion to compel was granted insofar as overlapping inmates still in custody. (1-SER-86-87.) The court, however, granted Appellees' "motion" to protect the personal information of overlapping inmates who were no longer in custody. (1-SER-87.) By implication, this ruling denied Doe's motion insofar as it sought contact information for overlapping inmates no longer in custody.

On May 13, 2022, Appellees filed a motion for summary judgment or, in the alternative, partial summary judgment. (3-SER-483-540; 4-SER-542-858; 6-SER-861-1091.) Doe filed opposition papers on June 3, 2022. (2-SER-206-249; 3-SER-251-471.) Appellees filed reply papers on June 13, 2022. (2-SER-138-205.)

On December 16, 2022, Magistrate Judge Standish issued her report and recommendation regarding the motion for summary judgment. Judge Standish recommended: (1) accepting the Report and Recommendation; (2) granting the

motion in full; and ( 3) entering judgment dismissing this action with prejudice. (1-SER-6-84.)  Doe filed objections to the Report (*see* 2-SER-109-137), to which Appellees replied.  (2-SER-92-108.) On February 16, 2023, the district court issued an order accepting the findings and recommendations, granting summary judgment, and dismissing the action with prejudice.  (1-SER-2-5].)  On March 15, 2023, Doe noticed this appeal. (7-SER-1499.)

## STANDARD OF REVIEW

Appellees agree (*see* AOB, 18) that a grant of summary judgment is reviewed de novo as to whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law, and that the evidence is viewed in the light most favorable to the nonmoving party.  *Sandoval v. County of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018).  However, this Court may also affirm the summary judgment "on any ground supported by the record, regardless of whether the district court relied upon, rejected, or even considered that ground." *American Federation of Musicians of United States & Canada v. Paramount Pictures Corp*., 903 F.3d 968, 981 (9th Cir. 2018) (internal quotes omitted).

To the extent this appeal implicates evidentiary rulings, such rulings are reviewed for an abuse of discretion "even when [they] determine the outcome of a motion for summary judgment." *Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). Under this standard, this Court will not substitute its judgment for that of the district

court simply because it would have reached a different evidentiary ruling. Rather, an abuse of discretion will be found only if this Court is firmly convinced that "the reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Boyd v. City & County of San Francisco*, 576 F.3d 938, 943 (9th Cir. 2009). In other words, the ruling must have been both manifestly erroneous and prejudicial to warrant reversal. See *Bias v. Moynihan*, 508 F.3d 1212, 1224 (9th Cir. 2007).

This appeal also encompasses the partial denial of a motion to compel disclosure of contact information for other inmates. (*See* AOB, 70-71.) The same abuse of discretion standard applies to that issue. See *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002). The district court is vested with broad discretion to permit or deny discovery, and a decision to deny discovery will not be disturbed except "upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant." *Data Disc, Inc. v. Systems Technology Assocs., Inc.*, 557 F.2d 1280, 1285 n. 1 (9th Cir. 1977).

Finally Doe seems to suggest in her introduction and statement of issues (AOB, 5-6) that the plain error standard of review applies to the various issues raised in her brief. As discussed above, this is incorrect. For this and other reasons, Appellees disagree with Doe's statement of the issues presented.

## ARGUMENT

## I. THE DISTRICT COURT'S SUMMARY ADJUDICATION OF DOE'S FIRST CLAIM WAS CORRECT

### A. Doe Fails to Demonstrate how her Deposition Testimony and Sworn Declarations were Supposedly Consistent

Doe's first claim for violation of the Fourteenth Amendment encompassed assertions that she was subjected to cruel and unusual punishment as a pretrial detainee because the temperature in the jail had been "bone chillingly cold." The district court summarily adjudicated that aspect of Doe's claim because the undisputed evidence established that, notwithstanding Doe's personal complaints, the ambient temperature was kept at 70 degrees, which was "not enough to support finding a possible constitutional violation." (1-SER-5, 35.) As the Magistrate Judgecorrectly noted, the Constitution prohibits temperatures that pose a "substantial risk of serious harm" to detainees, but does not require a "comfortable" temperature. (*See* 1-SER-34 (citing *Graves v. Arapaio*, 623 F.3d 1043, 1049 (9th Cir. 2010).)

Doe now argues the district court improperly characterized her deposition testimony and declarations on this issue as self-serving and uncorroborated. (AOB, 19.) She claims her testimony and declarations are consistent, and that (taken together) they support her assertion of a pulse drop due to temperature in the jail facility. (AOB, 19-22.)

15

As a threshold matter, however, Doe never even references or cites to her deposition testimony in the portion of her brief devoted to this issue. (*See* AOB, 19-22.) Doe therefore fails to show that her deposition testimony was, in fact, consistent with her declarations or that the district court mischaracterized that testimony. "Issues raised in a brief which are not supported by argument are deemed abandoned." *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988); *see also* F. R. App. Proc. 28(a)(8)(A) (appellant's brief must contain "the contentions of the appellant with respect to the issues presented, ***and the reasons therefor***, with ***citations to the authorities, statutes, and parts of the record relied on***")(emphasis added). Doe has therefore abandoned this issue by failing to support her assertion with reasoned argument or citations to the portions of the record purportedly supporting that assertion.

Even assuming *arguendo* that her declaration and deposition testimony are consistent, however, her claims based on jail conditions nonetheless fail for the reasons set forth below.

**B.    Appellees Carried Their Initial Burden of Showing No Substantial Risk of Serious Harm, and Doe's Evidence Failed to Raise A Genuine Issue of Material Fact**

A pretrial detainee asserting Fourteenth Amendment claims based on conditions of confinement must show: (1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) the conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk even though a reasonable official under the circumstances would have appreciated the high degree of risk involved; and (4) by not taking abatement measures, the defendant caused injury to the plaintiff. See *Roman v. Wolf*, 977 F.3d 935, 943 (9th Cir. 2020). Whether the conditions rise to the level of a constitutional violation involves an objective assessment turning on the particular facts and circumstances. *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018.) Minor or "de minimis" levels of imposition are insufficient to establish a constitutional violation. *Bell v. Wolfish*, 441 U.S. 520, 539 n. 21, 99 S.Ct. 1861 (1979). Consistent with the foregoing and the fact the Constitution does not mandate comfortable prisons or jails (see *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392 (1981)), this Court has held that prisoners or pretrial detainees are entitled to "adequate" heating, but not necessarily a "comfortable" temperature. *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996).

As the moving parties, Appellees bore the burden of establishing the absence of a genuine issue of material fact with regard to Doe's claim based on jail

conditions, including cold temperatures. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); F. R. Civ. P. 56(a). Appellees satisfied this burden by presenting evidence in the form of sworn declarations from two persons, Dave O'Connell and retired Commander Mark Stichter, showing that: (1) the WCJ had an air conditioning system and exhaust fans in restrooms and common areas designed to move fresh air throughout the building; (2) the system was monitored and controlled by a computerized system, and managed by a civilian Facilities Operations staff; (3) jail staff did not have the ability to change the temperature in the WCJ; (4) the temperature in the WCJ was kept at reasonable and livable temperatures for inmates; and (5) while temperatures within the WCJ could vary from zone to zone within the facility and depending on the particular season, the average temperature system set point was 70 degrees. (6-SER-1031, 1038.) Appellees also offered evidence of Doe's admission that she was only cold during the time she was on the first floor of the WCJ (*i.e.*, during the booking process and after returning from court) and not during the entire time she was at the WCJ. (4-SER-547, 654; 6-SER-882-83.)

This affirmative evidence satisfied Appellees' initial burden of establishing no genuine issue of material fact concerning an essential element of Doe's claim, *i.e.*, that the conditions put the plaintiff at substantial risk of suffering serious harm. The burden then shifted to Doe to establish, via admissible evidence, a genuine issue

of material fact.  See *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000.)  Her only response to the evidence establishing that the temperature in the WCJ was computer-controlled to 70 degrees was to speculate that the "temperature monitor might not correctly display the temperature."  (4-SER-550.)  But speculation unsupported by specific facts or corroborative evidence is insufficient to raise a triable issue of material fact.  See *Rivera v. National R.R. Passenger Corp.,* 331 F.3d 1074, 1078 (9th Cir. 2003); *FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).

Unable to competently dispute the evidence establishing that the temperature in the WCJ was set to 70 degrees, Doe's opposition below relied largely on her own declaration (which parroted her deposition testimony) in which she claimed she told deputies she was "cold to death" and that her pulse dropped from 90 to 57.  (3-SER-252.)  But as the district court found, Doe's declaration contained no details concerning the methodology of measuring her pulse.  Moreover, neither the declaration nor the opposition in general contained competent medical evidence establishing that her pulse did, in fact, drop from 90 to 57.[4]  Finally, neither Doe's

---

[4]  Doe cited below to a document filed under seal that listed vital signs for someone whose name was redacted.  (3-SER-252 [citing to Dkt. No. 93-1].)  As a threshold matter, Doe failed to include evidence in her opposition establishing that the sealed document pertained to her instead of someone else.  But even assuming the document reflected Doe's vital signs at a particular time, the document and Doe's medically-uncorroborated assertion that her normal pulse rate is 90 were insufficient to establish that she sustained a reduced pulse rate due to the ambient

declaration nor her opposition contained competent evidence that any purported pulse drop was attributable to the ambient temperature in the WCJ as opposed to other reasons such as the ingestion of drugs or physical inactivity. Consequently, Doe failed to offer evidence sufficient to raise a triable issue of fact that the temperature in the WCJ posed a substantial risk of harm or otherwise caused injury to her.[5]

Doe notes that she alleged in her pleading that she asked for a blanket or clothing upon her arrival at the WCJ. (AOB, 21.) But even assuming *arguendo* the truth of this allegation, the mere request for a blanket or clothing does not establish that the conditions put her at substantial risk of suffering serious harm. Moreover, Doe's allegations do not constitute evidence for purposes of raising a genuine issue of material fact. See *Anderson, supra,* 477 U.S. at 256, 106 S.Ct. 2505 (non-moving party cannot oppose a properly-supported motion for summary judgment by "rest[ing] on mere allegations . . . of his pleadings.").

Doe also claims that other inmates complained about the temperature in the

---

temperature in the jail instead of some other reason.

[5]  Doe spends a substantial amount of time and space erroneously claiming that the district court "disbelieved" her and/or "rejected [her] account" of events. (*See* AOB, 19 et seq.)  In fact, a reading of the report and recommendation shows that the Magistrate Judge did, in fact, consider Doe's evidence (both on this issue and others), but determined that it was simply insufficient to raise a genuine issue of disputed fact for any number of reasons. (*See, e.g.,* 1-SER-30:18, 44:3, 44:12, 49:14, 53:21.)

WCJ. (AOB, 21.) But the document she cites in connection with this assertion is an ACLU report published in June, 2017, years before Doe was confined in the WCJ. (3-SER-259.) Moreover, the claims and grievances described in the report arose as long ago as 2011. (*See id.* at 262.) This fact, combined with the 2017 publication date of the report, establishes that the two references in the ACLU report to "freezing" temperatures arose many years before Doe's detention. In sum, two factually-bereft references involving inmates detained several years prior to Doe are simply too remote in time and context to constitute evidence sufficiently probative to permit a reasonable trier of fact to find in Doe's favor. See *Anderson, supra,* 477 U.S. at 249-250, 106 S.Ct. at 2511 (opposing evidence must be sufficiently probative to permit reasonable trier of fact to find in favor of party opposing motion).

Doe also takes issue with the district court's observation that she failed to offer evidence that other inmates would testify similarly regarding the temperature in the WCJ (*see* 1-SER-34 n. 21), arguing that the Magistrate Judge prohibited her from disclosing the identities of other inmates who would supposedly testify in support of her temperature-related contentions. (*See* AOB, 19.) Doe cites "ECF 102" in connection with this argument, but that minute order was, in fact, silent on the issue of disclosure of inmates' names. (6-SER-1092-1094.) The "evidence" Doe cites therefore fails to support her argument.[6]

---

[6] Doe's opening brief improperly contains an "appendix" consisting of a document

Doe also erroneously claims the district court required her to "corroborate" her declaration. Not so. The district court merely observed that Doe's declaration (and deposition testimony) were uncorroborated by any other independent testimony or documentary evidence, and that in key instances Doe's declaration and testimony lacked foundation or suffered from other evidentiary infirmities. (*E.g.,* 1-SER-29, 30, 44:5-7, 45:16-1846:8-11.) The district court never imposed, either expressly or implicitly, any "requirement" of corroboration.

None of the cases cited by Doe on the jail conditions issue warrant reversal.[7] She cites *Robins v. Centinela State Prison,* 19 Fed.Appx. 549, 550 (9th Cir. 2001), an unpublished opinion issued before 2007. (*See* AOB, pp. 19, 22.) *Robins* is neither properly citable nor precedent. *See* F.R.App.P. 32.1(a); Ninth Cir. R. 36-3(a) and (c). Putting aside the fact that Doe has violated court rules by citing *Robins*, the case

_____

that was not filed in the district court. Concurrently with this brief, Defendants have filed a motion to strike this portion of Doe's brief. However, even if this Court were to permit the document to be included in the record, it would not warrant reversal. The document, which is a string of emails between Doe and counsel for Appellees, contains an email dated April 5, 2021 setting forth the names of inmates who were purportedly incarcerated with Doe and remained in custody as of that date. But the document does not indicate what these other inmates would say. Consequently, it is pure speculation that the other inmates would testify that the temperature in the WCJ was "bone-chillingly cold."

[7] Doe's opening brief does not contain a table of authorities, an omission that violates Federal Rule of Appellate Procedure 28(a)(3) and Circuit Rule 28-1(a). This Court may strike briefs that fail to comply with those rules. *See* Ninth Cir. R. 28-1(a).

is distinguishable. In particular, it appears that the non-moving party in *Robins* offered both a declaration and deposition testimony that was consistent with the declaration. In the present case, Doe's self-serving declaration was uncorroborated. It also contained no details concerning the methodology of measuring her pulse, competent medical evidence establishing that her pulse did, in fact, drop from 90 to 57 at any point, and nothing tending to establish that any purported drop was attributable to ambient temperature as opposed to other reasons such as the ingestion of drugs or physical inactivity. Accordingly, unlike the opposition evidence offered in *Robins*, Doe's evidence was insufficient to raise a genuine issue of material fact.[8]

*Leslie v. Grupo ICA,* 198 F.3d 1152 (9th Cir.1999) involved claims by a plaintiff that the defendants had agreed to pay him fees for facilitating a business opportunity. The plaintiff's deposition testimony and declaration opposing defendants' motion for summary judgment were consistent, but were contradicted by letters the plaintiff had written prior to the lawsuit. *Leslie, supra,* 198 F.3d at 1154. Significantly, the defendants acknowledged that the plaintiff's deposition testimony and declaration in opposition would be sufficient to overcome summary judgment if believed. *Id.* at 1156. The trial court granted the motion on the basis

---

[8] Doe also claims *Robins* stands for the proposition that "one party's assertions can be enough to defeat a summary judgment motion." (AOB, 22.) To the extent Doe is claiming that mere allegations are sufficient to defeat a properly-supported motion for summary judgment, she is simply wrong. See *Anderson, supra*, 477 U.S. at 256, 106 S.Ct. 2505.

that the plaintiff's testimony and declaration were perjurious and manufactured. *Id.* at 1156. But the Ninth Circuit reversed, finding that the "sham affidavit" rule did not apply because the plaintiff's testimony and declaration were consistent, the trial court and defendants had acknowledged that the testimony and declaration would be sufficient to defeat summary judgment if credited, and the testimony and declaration sought to explain the statements in the letters. *Id.* at 1158. Accordingly, because a jury might accept the plaintiff's reconstructed version of events, this Court found that summary judgment was inappropriate.

The present case does not involve assertions of a "sham affidavit." Moreover, unlike the defendants in *Leslie*, the County does not concede that Doe's deposition testimony and declaration, even if credited, raise a genuine dispute as to any material fact on her claim based on temperature-related jail conditions. On the contrary (and as discussed above), Doe's "evidence," even if credited, failed to raise a genuine dispute of fact that the ambient temperature in the WCJ posed a serious risk of harm to her, nor did it tend to refute that the temperature was computer-controlled at approximately seventy degrees while she was detained. Moreover, Doe's "evidence," even if credited, failed to establish that the purported drop in her pulse rate was, in fact, attributable to the ambient temperature as opposed to other medical and/or non-medical reasons.

*Foster v. Arcata Assoc.,* 772 F.2d 1453, 1461 (9th Cir.1985), *cert. denied*, 475

U.S. 1048, 106 S.Ct. 1267, *overruled on other grounds by Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991), is even more dissimilar in part because it involved claims of sex and age discrimination governed by the *McDonnell Douglas* burden-shifting structure that is not at issue here. See *Foster, supra,* 772 F.2d at 1458-59. Putting that aside, the district court in *Foster* erred not necessarily because it disbelieved or discounted the opposing party's declaration, but rather because it mis-analyzed the critical issue. The district court concluded that because the opposing party's declaration was silent as to whether she was as qualified as the person who had been hired instead of her, she could not establish that she was qualified for the position. This Court correctly observed that the issue instead was whether the opposing party possessed the minimum qualifications for the job, not whether she was as qualified or more so than the hired person. *Id.* at 1460.

Doe cites *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017) in connection with her argument that the district court improperly weighed Appellees' evidence against her evidence. (AOB, 22.) Notably, the portion of the *Lowry* decision on which Doe relies came from the dissent in that case. *Id.* at 1263. Putting that aside, the district court's order reveals that no weighing of evidence occurred in this case. The district court specifically noted in its order that it was required to believe Doe's evidence and draw all justifiable inferences in its favor. (*See* 1-SER-20.) However, as the district court noted, Doe produced no competent evidence

tending to dispute Appellees' evidence that the WCJ's climate control system was mechanically set to an average of 70 degrees. (1-SER-34.) The district court also correctly determined that even if Doe's claim that she was "cold to death" was credited, it was insufficient to find a constitutional violation because the issue was whether the conditions subjected her to a substantial risk of harm, not whether she experienced discomfort. (1-SER-35.) And as to the "pulse drop" issue, the district court considered Doe's declaration on that point but correctly concluded that her declaration contained no details concerning the methodology of measuring her pulse, no foundation for establishing that her pulse did, in fact, drop from 90 to 57, and no evidence that any purported pulse drop was attributable to the temperature in the WCJ as opposed to other reasons. (1-SER-34.) Accordingly, the district court did not "weigh" the evidence; rather, it correctly found that Doe's evidence was simply insufficient to raise a genuine issue of material fact even if credited.

*Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495 (9th Cir. 2015) involved a situation in which the district court completely "disregarded" the declaration submitted by the non-moving party. See *Nigro, supra,* 784 F.3d at 498. In contrast, as discussed above, the district court in the present case considered Doe's evidence but correctly concluded that it was inadequate to raise a genuine issue of material fact.

Similarly, the district court in *Securities and Exch. Comm. v. Phan,* 500 F.3d

895 (9th Cir. 2007) "refused to credit" certain statements in the non-moving parties' declarations and "disregarded" those declarations in connection with the issue of transaction restructuring. *Phan, supra,* 500 F.3d at 909. In contrast, the district court below, while accurately characterizing Doe's declaration as self-serving and uncorroborated, nonetheless considered it. (*See* 1-SER-19, 34-36.)

Finally, *Eisenberg v. Insurance Co. of N. Amer.*, 815 F.2d 1285 (9th Cir. 1987) is also distinguishable. The party opposing summary judgment in that case (the plaintiff) submitted not only his declaration in opposition to the motion but also two interoffice memoranda that, taken together, inferred that the plaintiff had been fired for refusing to cooperate in the violation of Department of Insurance guidelines. *See id.* at 1289. Thus, the evidence proffered by the non-moving party in *Eisenberg* involved corroborating documentary evidence.

## II.    THE DISTRICT COURT APPLIED THE CORRECT STANDARDS FOR PRETRIAL DETAINEES UNDER THE FOURTEENTH AMENDMENT

Doe's brief contains a four-page exegesis of Fourteenth Amendment legal parameters pertaining to pretrial detainees. (AOB, 29-33.) But at no point during that discussion does Doe explain how the district court's ruling purportedly violated the Fourteenth Amendment. Instead, this portion of her brief is simply an attempt at a dissertation on the Fourteenth Amendment. By failing to apply the stated law

to the facts of this case, Doe's brief runs afoul of Rule 28(a)(8) of the Federal Rules of Appellate Procedure, which requires the argument section of the opening brief to contain (among other things) "appellant's contentions and the reasons for them . . . ." *See* F.R.App.P. 28(a)(8)(A).

Putting aside that flaw, to the extent Doe is implying that the district court erred by failing to apply the Fourteenth Amendment (instead of the Eighth Amendment), she is wrong. The district court specifically applied Fourteenth Amendment principles in reaching its conclusions. (*See* 1-SER-7, 21.)

## III.   THE SEARCHES DID NOT VIOLATE DOE'S RIGHTS

Doe asserts a variety of claims premised on purportedly unconstitutional searches that occurred while she was detained at the WCJ. Specifically, Doe's third claim asserts a section 1983 claim based on the Fourth Amendment and due process violations stemming from seven claimed "strip searches." Her eleventh claim asserts the searches were unreasonable under article I, section 13 of the California Constitution. Her fourteenth claim asserts the searches violated her privacy rights under article I, section 1 of the California Constitution. And her sixteenth claim alleges a violation of California Penal Code section 4030, which governs strip searches and body cavity searches in county jails.

### A.   <u>WCJ Policies Regarding Searches</u>

The searches to which Doe was subjected were defined under WCJ policy as

"Extended Correctional Searches" (a/k/a "body searches"). As discussed above, such searches require the inmate to remove all garments down to, but not including, the inmate's bra and panties, so that a deputy may examine the inmate's outer garments and visually inspect the inmate's undergarments. They do not involve complete nudity.

WCJ policy defines a "strip search" as something different -- a search that includes a visual inspection of an inmate's breasts, buttocks, or genitalia. Doe admits that her genital areas were never fully exposed or touched during any of the searches at issue in this case. (5-SER-738-39.) She also admits that she was not fully nude during the body searches.[9] (1-SER-38; 4-SER-581-584, 641-643, 647, 668-670, 673-74; 5-SER-730-31, 738-39.) Consequently, none of the searches in question were "strip searches" as defined by WCJ policy.

As noted above, the objective of both types of searches is to detect, control, and prevent the intake and introduction of contraband into WCJ, and to preserve the security and safety of inmates and WCJ staff.

**B.** **California Penal Code Section 4030 is Inapplicable Because the Searches Occurred After Doe was Placed in General Population**

---

[9] As discussed below, Doe claims her mandatory shower, in which she was fully nude, constituted a "search." The shower did not, in fact, constitute a search, but even assuming it did, the circumstances under which the shower was taken were reasonable for Fourth Amendment purposes.

The district court summarily adjudicated Doe's sixteenth claim because all of the alleged searches occurred after the booking process was completed, whereas Penal Code section 4030 by its terms only applies to searches conducted "prior to placement in the general jail population." (1-SER-54 [quoting Cal. Pen. Code § 4030(e)].) Doe now argues that section 4030 applies to her notwithstanding this temporal limitation because the definition of "strip search" set forth in the statute (section 4030(c)(3)) describes the type of searches to which she claims she was subjected, i.e., she was required to remove or arrange clothing so as to permit a visual inspection of her underclothing, breasts, buttocks, or genitalia. (AOB, 33-34.)

This argument misses the proverbial point because it ignores the basis for the court's ruling. By its express terms, section 4030 does not apply to searches that occur after a detainee or prisoner is placed in the general jail population. *See* Cal. Pen. Code § 4030(e); see also *Yourke v. City & County of San Francisco*, 2010 WL 3701789, *4 (N.D. Cal., Sept. 16, 2010) (strip search that occurred after plaintiff had been classified for custodial housing and after which plaintiff was dressed in jail clothes was not subject to section 4030 because the plaintiff was "destined for the general jail population"). Doe does not dispute that none of the searches occurred prior to her placement in the general jail population (*see* AOB *generally*; 1-SER-54; 4-SER-580, 629, 633-34, 640), nor does she argue otherwise in her brief. Accordingly, it does not matter which particular label Doe wishes to place on the

searches. Because none of them occurred before she was placed in the general jail population, section 4030 cannot serve as a basis for imposing liability.

## C.    The Body Searches Were Constitutionally-Permissible

Doe complains that the Extended Correctional Searches were "unnecessary or unjustified." She argues that there was insufficient justification for the searches and that they should have been conducted somewhere with more privacy than a hallway. (AOB, 35-38.) Again, Doe is wrong in all respects.

"The difficulties of operating a detention center must not be underestimated by the courts." *Florence v. Board of Chosen Freeholders of the County of Burlington*, 566 U.S. 318, 326, 132 S.Ct. 1510 (2012). In that regard, "[a] detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record . . . and in other cases." *Bell, supra,* 441 U.S. at 559, 99 S.Ct. 1861 (1979). For these and other reasons, the Supreme Court has concluded that judicial deference to prison and jail administrators should be "wide-ranging," especially with regard to "the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547, 99 S.Ct. 1861.

Because of these security dangers, so-called strip searches and body cavity searches of pretrial detainees do not violate the Fourth Amendment if the searches are reasonable. *Bell, supra,* 441 U.S. at 558-561, 99 S.Ct. 1861. In particular, federal courts have routinely upheld the validity of strip searches conducted after events such as processing into a custodial facility, contact visits with third persons, movement between units or jail areas, and travel to and from court. *See, e.g., Florence, supra,* 566 U.S. at 332, 132 S.Ct. 1510 (visual body cavity search upon admission to jail); *Bell supra,* 441 U.S. at 558-560, 99 S.Ct. 1861 (visual strip searches after every contact visit); *Michenfelder v. Sumner*, 860 F.2d 328, 334-36 (9th Cir. 1988) (visual body cavity searches on inmates leaving or returning to unit); *Rickman v. Avaniti*, 854 F.2d 327, 328-29 (9th Cir. 1988)(visual strip searches of inmates leaving cells in disciplinary segregation unit); *Richerson v. Lexington Fayette Urban County Gov't*, 958 F.Supp. 299, 306-07 (E.D. Ky. 1996) (strip searches of detainees upon return from court).

Whether a search of pretrial detainees is reasonable under the Fourth Amendment requires a case-by-case 'balancing of the need for the particular search against the invasion of personal rights that the search entails . . . .'" *Byrd v. Maricopa County Sheriff's Dept.*, 629 F.3d 1135, 1141 (9th Cir. 2011). Factors to consider include: (1) the scope of the particular intrusion; (2) the manner in which the search is conducted; (3) the justification for initiating the search; and (4) the place where it

is conducted. *Id.* As the district court noted (*see* 1-SER-39), courts also sometimes consider whether the search was reasonably related to legitimate penological interests. *Bull v. City and County of San Francisco*, 595 F.3d 964, 973-74 (9th Cir. 2010).

### i.  The scope of the intrusion was reasonable

As discussed above, the searches did not occur until after Doe had been processed and had either been placed in the WCJ general population (searches 2 through 7) or was destined to be placed there (search number 1). Doe's genitals and breasts were never exposed during any of the strip searches, she remained in her bra and underwear, she was never touched, she was never completely naked, and the searches were performed by female staffers. The scope of the alleged intrusion was therefore moderate and reasonable under the circumstances.

Doe, however, contends she was forced to be completely naked in front of WCJ staff and other inmates in connection with a mandatory shower. (AOB, 8 and 37.) Specifically, she asserts that she had to take off her clothing, walk across the room to the shower unit (which had a translucent curtain), walk back across the room after the shower, receive clothing, and then get dressed all while other naked female detainees were present. (3-SER-253.)

As a threshold matter (and as the district court noted), Doe's third claim specifically references only "strip searches." (7-SER-1445-46.) Consequently,

Doe's claim should not be read to encompass the mandatory shower, which involved no visual inspection or search of Doe's person.

But even assuming the shower can be considered a search for purposes of this claim, the district court's ruling was nonetheless correct. As a threshold matter, the WCJ has a legitimate penological interest in requiring newly-arrived detainees to shower for hygienic purposes and to inhibit the spread of disease and/or infection. (5-SER-809; 6-SER-1032.) In that regard, the "admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a detainee himself or herself . . . [including] . . . [t]he danger of introducing lice or contagious infections," which "is well documented." See *Florence, supra,* 566 U.S. at 330-31.

In the face of this legitimate penological interest, it was not unreasonable to require Doe to shower. In turn, it was reasonable that the group detainee shower was generally monitored by female staff members to prevent fights or sexual assaults and to make sure that Doe and the other inmates did, in fact, shower. While detainees have the right to bodily privacy, that right is limited and subject to reasonable intrusion. *See Byrd v. Maricopa County Bd. of Supervisors*, 845 F.3d 919, 923 (9th Cir. 2017); *Grummett v. Rushen*, 779 F.2d 491, 494-96 (9th Cir. 1985). In this instance, the staff members monitoring the group shower were female. (5-SER-739.) That fact distinguishes this case from other decisions in which pretrial detainee

bodily privacy was held to have been violated. *See, e.g., Sepulveda v. Ramirez*, 967 F.2d 1413 (9th Cir. 1992)(male officer entered restroom while female parolee was providing urine sample); *Vasquez v. County of Kern*, 949 F.3d 1153, 1160-62 (9th Cir. 2020)(reasonable jury could conclude that male corrections officer violated female ward's privacy rights by peering through gap in shower curtain to observe ward as she showered); *Grummett, supra,* 779 F.2d at 494 (assuming without specifically deciding that "the interest in not being viewed naked <u>by members of the opposite sex</u> is protected by the right of privacy")(emphasis added).

Moreover, Doe does not assert that she was observed the entire time she was in the shower. She admits the shower area itself was obscured by a translucent shower curtain. Doe was thus naked in the presence of other detainees and staff members only when she disrobed and then after she finished her shower and went to receive her clothing. No touching or visual searching of private areas occurred in connection with the shower. And the shower was a one-time occurrence for Doe while she was in the WCJ. Under these circumstances, the fact that Doe was required to disrobe briefly on one occasion to take a necessary shower did not violate the Fourth Amendment because the alleged intrusion was reasonable in light of the penological interests that were upheld. *See Whittington v. California Dep't of Corrections & Rehabilitation,* 2010 WL 761314, at *2 (N.D. Cal., March 3, 2010); *Litmon v. Santa Clara County*, 2009 WL 890884, at *4 (N.D. Cal., March 31, 2009).

35

### ii.    <u>The manner in which the searches were conducted was reasonable</u>

The manner in which each search was conducted was reasonable. In each instance, only female deputies conducted the searches. Each search involved small groups of female inmates. None of the searches involved touching or exposure of genitalia or breasts. None of the searches involved force, let alone excessive force. And Doe "has not alleged that there was any sexual component to any of the searches, *i.e.,* that they were conducted in a sexually abusive or sexually harassing manner or for untoward sexual purposes." (*See* 1-SER-39:20-22.)

Instead, Doe argues that she was required to pull down her underwear and lift/twist her menstrual pad to expose the underwear beneath it. (AOB, 37.) But this fact does not render the searches unreasonable. Doe did not allege (and did not establish in her opposition) that she was required to actually remove the pad; rather, she was merely required to lift or twist it to expose the underwear beneath it so that a deputy could see that there was no contraband in the pad. This aspect of the searches was therefore not unreasonable.

Aside from her complaint about being required to twist her menstrual pad to allow a view of her undergarments, Doe's contentions concerning the manner in which the searches were conducted essentially boil down to her own opinion on how and why the searches should have been conducted. (AOB, 36-38.) But Doe's

opinions do not constitute evidence, and they are certainly insufficient to raise a genuine dispute of material fact.

None of the cases she cites is applicable, either. *Kirkpatrick v. City of Los Angeles*, 803 F.2d 485 (9th Cir. 1986), dealt with strip searches of police officers accused of theft, not pretrial detainees. *Brown v. Polk County, Wisconsin*, _____ U.S. _____, 141 S. Ct. 1304, 209 L.Ed.2d (2021) (memorandum opinion) involved a penetrative body cavity search. *Birchfield v. North Dakota*, 579 U.S. 438, 136 S.Ct. 2160 (2016) discussed warrantless breath and blood tests, none of which occurred in this matter.

### iii. The searches were justified

The searches were justified to prevent or inhibit entry of contraband or weapons into the WCJ, and to protect staff and inmates. In that regard, the searches were

consistent with both established law[10] and WCJ policy.)

Doe does not dispute that there is a strong penological interest in preventing the influx of contraband in jails and protecting jail staff and inmates. Instead, she argues that the searches were not justified in part because jail daily logs purportedly

---

[10] See *Florence, supra,* 566 U.S. at 327 (noting that policies designed to keep contraband out of jails "have been upheld in cases decided since *Bell*.")

"show no significant violence or drug problems in WCJ" and because the searches in question supposedly did not uncover any weapons or contraband. (AOB, 37-38.)

Even assuming these assertions have foundation, the Supreme Court has rejected a nearly identical argument. In *Bell v. Wolfish, supra,* the evidence indicated only one prior occasion of an inmate being discovered attempting to smuggle contraband into the facility at issue. *Bell, supra,* 441 U.S. at 559, 99 S.Ct. 1861. Moreover, the detainees were under video surveillance during periods of contact visits and were wearing one-piece jumpsuits that would make secreting objects in bodily orifices (other than the mouth) difficult. *See id.* at 577-78 (J. Marshall dissenting). But the Supreme Court rejected the notion that this evidence rendered the searches at issue in that case unconstitutional, noting that the absence of discovered contraband "may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises." *Id.* at 559; see also *Florence, supra,* 566 U.S. at 326-27 (noting the result in *Bell* despite only "one instance in which an inmate attempted to sneak contraband back into the facility").

Similarly, the asserted absence of "significant violence or drug problems" in the WCJ and the purported fact that the searches in question did not reveal any weapons or contraband are just as likely attributable to the deterrent effect of the staff's enforcement of WCJ search policies, or even to happy coincidence, as

anything else.  Doe cites no authorities supporting the novel proposition that the mere absence of discovered contraband or weapons is indicative that the searches in question are constitutionally infirm.  Accordingly, her contention lacks merit.

Doe also argues that the searches were improper because the charges against her did not involve weapons or contraband, and because she had already been pat-down searched and forced to take a mandatory shower in the presence of WCJ staff. (AOB, 37-38.)  As to the former assertion, the nature of criminal charges has no impact on the reasonableness of a search for Fourth Amendment purposes, and Doe does not cite any authority supporting her argument in that regard.  It is axiomatic that a detainee facing non-weapons charges could potentially smuggle in contraband or weapons just as easily as a detainee facing more serious charges.  Moreover, it is also possible, if not likely, that detainees and prisoners would begin using inmates and detainees facing lesser charges as "mules" if institutions such as the WCJ were forced to modify search policies to take into account the relative seriousness of criminal charges.  Furthermore,  as the Supreme Court has observed, it is "difficult if not impossible" to identify "inmates who have propensities for violence, escape, or drug-smuggling," with the task made all the more difficult "by the brevity of detention and the constantly changing nature of the inmate population."  *Block v. Rutherford*, 468 U.S. 576, 587, 104 S.Ct. 3227 (1984).   Consequently, the reasonableness of a search for Fourth Amendment purposes cannot depend on the

nature of the criminal charges. This is particularly true where, as here, detainees facing more serious charges are housed together with those facing lesser charges – segregating them for purposes of searches would pose logistical nightmares to the WCJ staff.

Doe's latter argument, *i.e.*, that subsequent searches were unreasonable because she had already been pat-searched and required to take a shower under observation, ignores the passage of time between those events and the subsequent searches. The subsequent searches did not occur until August 10 and August 12, 2019, well after a sufficient period of time had passed after the initial pat-down and shower for a detainee in Doe's position to potentially obtain contraband, weapons, or drugs from within the facility. In that regard, any ruling tending to restrict the discretion of jail officials to conduct Extended Correctional Searches it is well-established that

### iv.    The searches were performed in reasonable places

This Court has previously rejected the notion that strip and body cavity searches (none of which occurred here) must be conducted in a private area out of the view of other prisoners. *See Thompson v. Souza*, 111 F.3d 694, 701 (9th Cir. 1997). Moreover, this Court has upheld the practice of conducting strip searches in groups. *Cunningham v. Multnomah County*, 737 Fed. Appx. 814, 817 (9th Cir. 2018). Accordingly, it was reasonable to conduct the body searches in question in

group settings rather than in a private cell. Doe's contention otherwise is particularly disingenuous given her assertion (AOB, 56) that the WCJ is unconstitutionally overcrowded. If, as she posits, the jail is overcrowded, it weighs against being able to perform body searches of numerous inmates one at a time in a private cell.

The lone case cited by Doe on this issue is *Robins, supra* (*see* AOB, 38)*,* which is not properly citable under Circuit Rule 36-3(c). In any event, *Robins* involved inappropriate groping of a male inmate by a female officer. Nothing similar occurred to Doe.

### D. The FAST Search was Constitutionally Permissible

### i. The FAST search did not violate the Fourth Amendment

Although she admits that the purpose of FAST searches is legitimate (*see* 4-SER-589), Doe argues that the FAST search on August 11, 2019 was somehow unconstitutional because no similar search had taken place on the day before and because the WCJ did not adhere to a typical schedule of conducting two such searches each day. (AOB, 39.) Doe thus speculates that the FAST search on August 11 was retaliatory and harassing. (AOB, 40-41.)

Supreme Court precedent establishes that "shakedown" searches are constitutionally permissible in custodial settings under the Fourth Amendment. *See Bell, supra,* 441 U.S. at 556-57, 99 S.Ct. 1861; *Hudson v. Palmer,* 468 U.S. 517, 526 and 530, 104 S.Ct. 3194; *Block, supra,* 468 U.S. at 589-591, 104 S.Ct. 3227. These

three cases and their progeny establish that Fourth Amendment liability under claim number 4 cannot be predicated on the FAST search.

Moreover, it does not matter for Fourth Amendment purposes whether the search in question was purportedly motivated by retaliation or was harassing in nature. *See Hudson, supra,* 468 U.S. at 530. What matters is that the objective of the FAST search was reasonably related to what Doe admits is a legitimate penological goal, i.e, the detection, control, and prevention of the intake and introduction of weapons, contraband and illegal items into the WCJ. And the FAST search in this instance unquestionably furthered that goal because it disclosed three illegally altered razors. (1-SER-66.) Custodial officials are also imbued with substantial discretion to conduct searches at irregular intervals and odd hours in order to carry out the legitimate penological objectives of those searches. *See Florence, supra,* 566 U.S. at 327-28, 132 S.Ct. 1510; *Hudson, supra,* 468 U.S. at 529, 104 S.Ct. 3194.

Doe criticizes the district court's citation to *Hudson, supra,* concerning the constitutionality of "shakedown" searches, noting that she was only a pretrial detainee, not a prison inmate. (AOB, 40.) But Doe fails to appreciate that the Supreme Court in *Bell* concluded years before *Hudson* was decided that unannounced searches at irregular intervals of pretrial detainee living areas do not violate the Fourth Amendment. *Bell, supra,* 441 U.S. at 556-57, 99 S.Ct. 1861. And

on the same date *Hudson* was decided, the Supreme Court also held that random cell searches do not violate the constitutional rights of pretrial detainees. *See Block, supra,* 468 U.S. at 589-591, 104 S.Ct. 3227. Simply put, "[c]ourts . . . have recognized that pretrial detainees, like convicted prisoners, have no reasonable expectation of privacy in their cells entitling them to Fourth Amendment protections." *Ruiz v. Snohomish County*, 2019 WL 11894363, *2 (W.D. Wash., Sept. 5, 2019). Doe's status as a pretrial detainee does not save her claim.

### ii.    <u>The FAST search did not violate the First Amendment</u>

Doe's fifth claim asserts that the FAST search violated her First Amendment rights because it was retaliatory in nature. This contention is predicated on speculation.

Doe posits that the search was retaliatory simply because it occurred after midnight instead of during waking hours. (AOB, 42, 46 and 48) The evidence concerning FAST searches performed in the preceding days at most raised only an inference that the FAST search on August 11 might have simply been a "make up search" after only one such search was performed the preceding day. (*See* 1-SER-74.) Such a "make up" search, if that was the case, would not render the search unreasonable for Fourth Amendment purposes. Doe's conjecture that the search must have been retaliatory because it occurred in the early morning hours is simply insufficient to raise a genuine issue of disputed fact.

Doe also theorizes that the search was retaliatory because during the search a deputy purportedly expressed frustration at daytime noise levels in the module. (AOB, 47.)  But there is no evidence that the deputy's comments specifically tied the FAST search at issue to daytime noise levels; rather, the deputy purportedly threatened that such searches would <u>continue</u> unless the daytime noise level decreased.  (*See* 3-SER-254)  Moreover, Doe offered no evidence below that the threatened consequences, i.e., more nighttime FAST searches, actually occurred.

Doe also posits that the search must have been retaliatory because inmates were written up for the three altered razors found during this particular FAST search, whereas no inmates were written up when other searches found altered razors. (AOB, 49.)  But, as the district determined, the factual basis for this theory is incorrect – the records showed that other inmates were, in fact, written up for similar offenses disclosed by other searches.  (1-SER-76; 7-SER-1160, 1162, 1180, 1182.) And even if this were not the case, Doe failed to submit any evidence that <u>she</u> herself was written up or that the reports for the other three inmates were arbitrary in nature. Consequently, this asserted basis for retaliation is unsupported.

Doe's retaliation theory is also undercut by the fact that the search was conducted as to the entire module, not just her.   Doe was not individually singled out or targeted by any of the searches.

44

None of the cases Does cites is apposite.  In particular, *United States v. Cohen*, 796 F.2d 20, 20 (2d Cir. 1986) involved a cell search by non-prison staff for a non-prison security reason.  *Cohen* also noted the "loss of [privacy] rights is occasioned only by the legitimate needs of institutional security."  *Id.* at 23.  Here, Appellees offered evidence that their searches were designed to detect and stop weapons and contraband, and Doe agreed with such.  (*See* 4-SER-589.)  Moreover, the three cases she cites regarding the alleged timing of the FAST searches (*Bates v. City of Little Rock*, 361 U. S. 516, 524, 80 S.Ct. 412 (1960); *Shapiro v. Thompson*, 394 U. S. 618, 634, 89 S.Ct. 1322 (1969); and *Kusper v. Pontikes*, 414 U. S. 51, 58-59, 94 S.Ct. 303 (1973)) have nothing to do with searches of cells.

## IV.  THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT AS TO THE *MONELL* CLAIMS

The  district court granted summary judgment as to Doe's *Monell* claims (i.e., claims 1-5 to the extent they are asserted against the County[11] and claims 7 and 8) on the basis that there can be no *Monell* liability where no injury or constitutional violation has occurred.  (1-SER-77-78.)  This ruling was correct.

---

[11]   Doe says the district court erred when it stated that claims 4 and 5 were brought only against the Deputy Appellees.  (AOB, 72.)  Even if true, summary judgment as to claims 4 and 5 was appropriate for the same reason applicable to claims 1 through 3, i.e., the County cannot be found liable under a *Monell* theory where no injury or constitutional violation has occurred.  *Jackson v. City of Bremerton*, 268 F.3d 646, 653-54 (9th Cir. 2001).

## A. The WCJ's Search Policy is Not Unconstitutional

Doe argues that the WCJ's distinction between strip searches and Extended Correctional Searches is euphemistic and misleading. But as discussed above, this argument is a non-starter with regard to the Penal Code section 4030 claim because that section only applies to searches conducted before placement in general population. Moreover, as discussed above, none of the various searches violated the Constitution. Accordingly, there can be no *Monell* liability on this basis.

## B. No Constitutional Violations or Injury Regarding the Shower or Changing in a Non-Private Area

Doe ignores the showing Appellees made below, *i.e*, that requiring inmates to shower upon entry is related to a genuine penological interest – the promotion of hygiene and prevention of disease/infection. She also ignored this stated interest in her opposition below. (*See* 2-SER-206, et seq.)

Instead, she focuses on the fact that she was required to be nude briefly in the presence of female deputies and other inmates in connection with the shower. (AOB, 54.) But as discussed above, even assuming the shower constituted a "search," the manner in which it was conducted was reasonable. Because there was no constitutional violation, there can be no municipal liability relating to the shower policy. *Jackson, supra,* 268 F.3d at 653-54.

As to the issue of having to change clothes in a non-private area, the district court correctly found that "[w]hile this even may have been embarrassing, the facts alleged are not gratuitous or excessive as to rise to the level of punishment or a constitutional violation." (1-SER-49:1-10.) Thus, Doe's suggestion (AOB, 55) that she was not given the benefit of all "favorable inferences" from the record is inaccurate. The court did, in fact, assume that being required to shower nude in the presence of others was embarrassing. But that does not rise to the level of a constitutional violation.

### C. No Unconstitutional Overcrowding

Doe's claims about the "overcrowding condition at WCJ" are speculation at best and unsupported by any precedent and/or evidence. *See Medina v. Morris*, 2014 WL 12686744, at *5 (S.D. Cal. June 2, 2014), report and recommendation adopted, 2014 WL 12684490 (S.D. Cal. July 24, 2014), which held that "the Court cannot grant summary judgment based on inadmissible hearsay in a conclusory, uncorroborated, self-serving declaration or affidavit that includes facts beyond the declarant's personal knowledge.") Her opening brief uses language like overcrowding "may" and "could" have an impact on various aspects of the inmates' experience. Thus, supporting the ideal that even Doe herself has no actual evidence that the overcrowding at WCJ was actually an issue let alone a constitutional

violation. Doe's commentary related to alleged overcrowding is not a legal question warranting appellate review.

### D. The Temperature of WCJ does not Amount to a Constitutional Violation

As demonstrated above, there is no reasonable or genuine dispute that the temperatures of the WCJ were adequate and did not cause substantial harm to Doe. Her "evidence," which primarily consists of her own declaration claiming the jail was "bone-chillingly" cold, fails to raise a genuine dispute. Her purported evidence of a pulse drop also lacks foundation and is incompetent as set forth above. Doe did not, and cannot, demonstrate a substantial risk of harm due to the temperature conditions in the WCJ.

### E. Doe has Not Shown any Policies or Conduct that Amounted to Punishment

Doe continues to fail to identify any specific policy and/or conduct that amounts to punishment of a pre-trial detainee. Defendants have shown in the evidence to their motion that there no constitutional violations and any such actions were related to a genuine penological purposes. It follows that, "[n]ot every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however... and the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little

restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" (Bell v. Wolfish, 441 U.S. 520, 537 (1979).)

## F.    Doe did Not Put the Jail's Recreation Policies at Issue in this Matter

The constitutionality of the policies related to "recreation" were not put into issue by Doe in her Fourth Amended Complaint ("FAC") or at issue in Defendants motion. Doe brought up the access to the patio (the jail's outdoor space) to support her arguments that the jail was overcrowded but, never directly contested that the "recreation policy" was unreasonable or unconstitutional.   (*See* 8-SER-1440.) Moreover, her opposition to the motion and objections to the Report & Recommendation are entirely silent as to the unconstitutionality of the "recreation policy." Further, the District Court made no ruling as to this issue. Given the above, the issue is not ripe nor at issue in this case, and this argument should be ignored.

## G.    Nothing in Doe's Brief changes the finding that the Lighting in the Jail was not Unconstitutional

Doe's argument on the issue related to the jail's light is devoid of any precedent or factual support whatsoever. It is nothing more than barren words which do not persuade this Court to overrule the District Court's ruling that the lighting in the jail at night was not unconstitutional. The District Court properly held that

"neither the Ninth Circuit nor any other federal court has held that prisoners have a right to sleep in complete darkness,…and other courts have held that continuous low-wattage lighting is permissible in jails or prisons." *Walker v. Woodford*, 454 F. Supp. 2d. 1007, 1014 (S.D. Cal. 2006). Nothing in Doe's appeal changes this ruling and summary judgment was proper.

## H.   WCJ Inmates are Provided with Constitutionally Satisfactory Hygienic Products

WCJ provided adequate basic hygienic products for inmates. The district court properly found that Appellees proffered evidence that all inmates are provided with personal hygiene products (i.e., "Welfare Pack") when they enter the facility and could ask for additional free products upon request.  (1-SER-32; 4-SER-695-96; 5-SER-722-23,  809,  819-20,  823; 6-SER-1031,  1034-35.)  Further,  the  Court acknowledged that Doe never even made a claim that she actually ran out of supplies, and she acknowledged that she purposely chose not to take a shower during the duration of her stay, thereby negating the need for the alleged shampoo she is demanding. (*Id.*)

Doe cites *Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016), a Seventh Circuit case, but ignores the fact that the evidence shows the Appellees satisfied the requirement of providing hygienic supplies by providing the initial free "Welfare

Pack," including a comb, toothbrush, toothpaste, and soap. Doe was provided (or given access to) sufficient hygienic supplies.

## V.    DOE WAS NOT SUBJECTED TO PUNISHMENT

Doe argues that the alleged denials of food, a blanket, forced to change in non-private areas, difficulty sleeping, the flushing toilets, the lack of permitted recreation time, and being forced to purchase additional hygienic supplies amounted to unconstitutional punishment. (AOB, 61-68.) To determine whether an alleged jail conditions amount to punishment, a court must consider whether the challenged condition caused harm or disability significantly exceeding or independent of the inherent discomforts of confinement, or whether the condition merely resulted from some legitimate governmental purpose. *Doe v. Kelly*, 878 F.3d 710, 714 (9th Cir. 2017). The record establishes that no punishment was imposed.

### A.    <u>One Missed Meal and Denial of a Blanket Did Not Constitute Punishment</u>

As to the alleged denial of food, Doe's claims are limited to one missed meal and her assertion that she requested food while in the booking process. (*See* 4-SER-546.) Because Doe was not formally booked until 4:26 p.m. on August 8 and because WCJ policy provided that the last daily meal is served at 4:00 p,m, Doe missed the evening meal on that date. The purported "denial" of a meal was

therefore simply a product of unfortunate timing. Doe received three meals a day in accordance with WCJ policy thereafter. (6-SER-885.)

To amount to punishment, the food deprivation must have been "repeated" and/or "sustained," resulting in pain or harm. *See Foster v. Runnels*, 554 F.3d 807, 814 (9th Cir. 2009). Here, the deprivation was not repeated or sustained. Moreover, Doe failed to produce evidence of pain or harm. The district court correctly agreed that the missed meal did not amount to punishment.

Doe's reliance on *Woods v. Thieret*, 903 F.2d 1080 (7th Cir. 1980), which dealt with an inmate who was deprived food for three full days, is misplaced. Similarly, *Dearman v. Woodson*, 429 F.2d 1288 (10th Cir. 1970) involved a refusal to provide food for more than two full days. *Id.* at 1289.

Doe's claim premised on alleged denial of a blanket is also meritless. First, Doe admitted that she was given a blanket. (4-SER-551). Her complaint is that she was not given a blanket until after she had been processed. (*Id.*) The temporary denial of a blanket for a relatively brief period of time does not constitute punishment.

Second, as discussed above, the jail was climate-controlled at an average of 70 degrees, which is not "bone-chilling" to a reasonable person. The constitution guarantees adequate heating, but not necessarily a comfortable temperature. *Keenan, supra,* 83 F.3d at 1091. Thus, while Doe subjectively may have felt cold, the

evidence shows that the facility was kept at a temperature that did not pose a substantial risk of harm.

*Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir. 1996), cited by Doe, is distinguishable because the prison guards in that case deliberately withheld blankets in "extremely cold indoor air temperature[s]." *Id.* at 1433. In contrast, the temperature in the WCJ was computer-controlled at an average of 70 degrees. Moreover, as noted above, Doe admitted that she was given a blanket once she was placed in general population. (*See* 4-SER-551, 649.)

## B. Alleged "Forced Nudity" in Connection with Mandatory Shower and Retrieval of Clothing Was Not Punishment

There is nothing in Doe's opening brief that would warrant reversal of the summary judgment on this issue. Doe's argument is mostly limited to comparisons to several cases outside of the Ninth Circuit that are not only non-binding but factually distinguishable. *Colbruno v. Kessler*, 928 F.3d 1155 (10th Cir. 2019) involved an inmate taken to a public hospital and forced to walk through the public areas of the hospital completely unclothed except for a pair of mittens. Conversely, Doe was never forced to appear nude in public.

Doe claims the court in *Doan v. Watson*, 168 F. Supp. 2d 932, 937 (S.D. Ind. 2001) found that observing misdemeanor detainees in the shower violated the inmates' Fourth Amendment rights. However, she falsely misstates the holding. In

fact, the court in *Doan* held that "the delousing procedure administered by the [d]efendants in the [county jail] violate[d] the Fourth Amendment's prohibition of unreasonable searches." (*Id.*) The holding had nothing to do with showering and/or nudity of inmates as she contends, but instead focused on the "delousing process."

Doe also misstates the ruling in *Burns v. Goodman*, 2001 WL 498231, at *7 (N.D. Tex. May 8, 2001), aff'd, 31 F. App'x 835 (5th Cir. 2002), in which the court found that the defendant government entity was entitled to judgment as a matter of law on a claim regarding the constitutionality of the alleged strip searches.

Doe also relies on *Shroff v. Spellman*, 604 F.3d 1179, 1191 (10th Cir. 2010), wherein an inmate was forced to expose her breast to pump breastmilk. Doe did not allege or offer evidence indicating that she had a similar need to pump breastmilk while incarcerated. Moreover, Doe admitted that her breasts were not exposed (except when she showered and exchanged clothes), and that she was provided (and forced to wear) a bra.

Doe's reliance on *Fisher v. Washington Metro. Area Transit Auth.*, 690 F.2d 1133, 1142 (4th Cir. 1982) is similarly misplaced. That case dealt with forced exposure of an inmate to members of the opposite sex.

Finally, Doe blanketly claims that the Eighth Amendment could be violated by "forcing inmates to expose their bodies for the purpose of humiliation." She relies on several cases that are inapplicable and again, very factually distinguishable:

*Calhoun v. Detella*, 319 F.3d 936, 940 (7th Cir. 2003) (searches of male inmates who were observed by female spectators making sexually explicit comments and gestures); *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987) (male inmate was consistently and fully exposed in his cell and in the shower to female guards in his housing unit); *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir. 1981) (female inmates' clothing was forcibly removed by male guards).

## C.  <u>Purported Sleep Deprivation Was Not Punishment</u>

The district court credited Doe's claim that she sustained some sleep deprivation due to "excessive toilet flushing," but correctly concluded that those allegations (and Doe's self-serving declaration) were insufficient to raise a genuine issue of material fact that the noise was unconstitutional punishment causing harm significantly in excess of the discomforts inherent in incarceration. (1-SER-58.) The Constitution does not mandate comfortable prisons. *Rhodes, supra*, 452 U.S. at 349, 101 S.Ct. 2392. Moreover, Doe admits that she did get at least some sleep, and the Constitution does not mandate that detainees and inmates be provided with a minimal amount of sleep. There is also evidence that Doe's inability to sleep was due to being scared rather because of other causes, including lights and noise. (4-SER-651.)

Faced with a lack of evidence that her interrupted sleep was any type of "punishment," Doe links several articles on the effects of sleep deprivation. (AOB, 66.) But these do nothing to bridge the gap between her claims and her evidence.

Doe takes issue with two of the cases cited by the district court, *Jones v. Neven*, 678 F. App'x 490, 493 (9th Cir. 2017) and *Chappell v. Mandeville*, 706 F.3d 1052 (9th Cir. 2013), in which courts held that while not being able to sleep because of lights and noise was unpleasant, the temporary and brief nature of this inconvenience did not rise to the level of punishment. Doe argues these cases applied the "deliberate indifference standard" rather than an "objective standard." But neither case applied a deliberate indifference standard to the issue of inmate sleep violations. Rather, *Jones* applied a deliberate indifference standard to an issue related to an inmate's Hepatitis status. *See* 678 Fed. Appx. at 492. As for *Chappell*, any discussion of the deliberate indifference standard came in the dissent in that case. *See* 706 F.3d at 1071 (J. Berzon dissenting).

Doe claims that Defendants "failed to provide any rationale for their decision to utilize industrial-style toilets instead of residential-style toilets…" However, the use of industrial style versus residential toilets was not a claim in Doe's FAC nor at issue in the motion. Instead, the issue is whether the modest noise from toilet flushing can be considered unconstitutional punishment in the context of a four-day detention. Notably, Doe has failed to offer anything other than pure speculation that

"residential-style toilets" are even a viable option in an incarceration setting involving hundreds of persons. This is insufficient to raise a genuine issue of material fact.

### D. Alleged 24-Hour Lockup Was Not Punishment

As discussed above, the evidence shows that Doe was not locked in a cell for 24 hours a day. During her four days at the WCJ, she was free to move around the module during daytime hours and she went outside on the roof patio on at least one occasion. She also went to court and back. Doe cites not authority standing for the proposition that these circumstances amount to "punishment" for constitutional purposes.

### E. Allowing the Purchase of Additional Hygienic Supplies Was Not Punishment

As noted above, when Doe was initially placed in her module, she was provided with a "welfare pack" including a comb, toothbrush, toothpaste, soap, and a menstrual pad. Moreover, if an inmate runs out of these standard supplies, the items are provided free upon a request and indigent inmates can order a "welfare pack" once a week. Moreover, Doe was provided with menstrual pads at no charge during her stay, and could order shampoo from the commissary. (3-SER-255; 6-SER-869-871, 1031, 1034.) The evidence shows Doe was supplied with or had access to hygienic supplies in abundance.

Doe's claim that she was "require[d]" to purchase additional hygienic supplies is therefore specious. She claims the record does not disclose that she was informed she could obtain additional supplies for free. But Doe never alleged or offered evidence that she ever ran out of any of the supplies as a threshold matter. Thus, whether or not she was ever informed by WCJ officials that she could obtain supplies at no charge is irrelevant, because she neither alleged nor established that she exhausted her initial welfare pack.

In any event, Doe cites no authority suggesting that requiring inmates to purchase hygienic supplies amounts to "punishment."

## VI.  THE DISTRICT COURT PROPERLY ADJUDICATED DOE'S STATE LAW CLAIMS

The district court properly found that the County is immune from Doe's state law causes of action under Government Code section 844.6(a)(2), which states that "a public entity is not liable for: . . . (2) an injury to any prisoner." The district court correctly agreed. Doe herself admits that section 844.6(a)(2) applies to the County. (AOB, 68.) Section 844.6(a)(2) applies to claims based on negligent supervision and hiring (*see Pina v. County of Los Angeles*, 2020 WL 13588159, at *8 (C.D. Cal., Jan. 2, 2020)), as well as to claims for negligence and intentional inflication of emotional distress (*see Wright v. State of California*, 122 Cal.App.4th 659, 672, 19 Cal.Rptr.3d 92 (2004)), which were the theories on which Doe's claim numbers 15

58

and 17 are predicated. (Defendants also argued below that the County is immune under Government Code section 815.2(b), which provides immunity for injuries resulting for the act or omission of a public employee. (3-SER-537.)

Doe contends that section 844.6 does not apply to the Individual Appellees. (AOB, 68-69.) But the Individual Appellees argued below that they are immune under Government Code sections 820.2 and 820.8. (3-SER-535-36.) The district court declined to address those particular grounds because Doe had not raised a genuine issue of material fact as to the merits. Given the de novo standard of review, this Court can and should consider those arguments on appeal in the event this Court determines that the district court's ruling as to the merits of Doe's claims is erroneous

Doe also fails to address two of the district court's alternative grounds for adjudicating the state law claims, i.e., (1) Appellees proffered sufficient evidence of training and supervision (*see* 6-SER-1030-31, 1042, 1048-50, 1055-57), and Doe's counter-evidence lacked sufficient foundation to competently dispute Appellees' evidence; and (2) the absence of any merit to Doe's constitutional claims effectively negated her state law tort claims. (1-SER-79-82.)

Finally, as to the intentional infliction claim, Doe posits that the Individual Appellees engaged in outrageous conduct because they "abused their positions of power." (AOB, 69-70.) As discussed above, however, the searches in question were

59

reasonable and non-retaliatory. Moreover, even taking Doe's allegations as true, there was no conduct that was "so extreme as to exceed all bounds that is usually tolerated in a civilized society." *Hughes v. Pair*, 46 Cal.4th 1035, 1051 (2009). At most, Doe's allegations and evidence paint a picture of Doe simply being upset about routine aspects of jail life. Such "petty oppressions" are not actionable. *Id.*

## VII. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN RULING ON DOE'S MOTION TO COMPEL

Doe argues the district court erroneously denied her motion to compel disclosure of contact information for inmates no longer in WCJ custody. (AOB, 70-72.) The court did not abuse its considerable discretion.

### A. Doe Was Provided Names of Overlapping Inmates Still in Custody

Doe's failure to offer any witness declarations or testimony (other than her own) was due to her own inexcusable neglect. Appellees provided to Doe, in accordance with the district court's order, the list of persons who overlapped in custody with Doe and who remained in custody. The Court stated Doe could contact those individuals through the usual channels and could seek additional time to complete her discovery if needed. (1-SER-86-87.)

Doe admits she was given the names of the overlapping inmates who were still in custody. (AOB, 70-71.) She also does not dispute that she never asked the court for additional time to contact those persons, take their depositions, or obtain

declarations. Doe thus has nobody to blame but herself for her failure to obtain declarations or depositions from this particular group.

## B.   The District Court Properly Denied Doe's Motion as to Pretrial Detainees No Longer In Custody

The district court did not abuse its discretion in denying Doe's motion in part. Former detainees have "significant privacy interests." (1-SER-89.) When balanced against Doe's interest in obtaining their identities and contact information (and considering that the district court permitted disclosure as to detainees still in custody), the court's ruling cannot be said to "lie[] beyond the pale of reasonable justification under the circumstances." *See Boyd, supra,* 576 F.3d at 943.

Even presently-confined detainees have privacy interests in their identifying or contact information. *See Tuffly v. U.S. Dept. of Homeland Security*, 870 F.3d 1086, 1093-94 (9th Cir. 2017); *Associated Press v. U.S. Dept. of Defense*, 554 F.3d 274, 286-88 (2d Cir. 2009). Such privacy interests only increase in strength once detainees have been released from custody. *See Bell, supra,* 441 U.S. at 546, 99 S.Ct. 1861. In that regard, persons in California "have a legally protected privacy interest in their home addresses and telephone numbers." *See County of Los Angeles v. Los Angeles County Employee Relations Com.*, 56 Cal.4th 905, 927, 157 Cal.Rptr.3d 481, 301 P.3d 1102 (2013). And in the case of detainees who have been released and may not ultimately be charged with any crime, disclosure of contact

and identifying information could also lead to embarrassing public revelations that those persons were previously arrested.

In light of these weighty privacy interests, the district court's decision to require disclosure of identities and contact information of overlapping detainees still in custody but not as to detainees who had since been released cannot be said to have been "beyond the pale of reasonable justification under the circumstances." *Boyd, supra,* 576 F.3d at 943.

Doe speculates that she was denied information that "could have been" important. (AOB, 71.) But Doe gives short shrift to the above-described substantial personal privacy rights that mitigate against disclosure of the requested information. She also ignores the fact that she obtained no declarations and took no depositions of any of the detainees whose names were, in fact, disclosed to her. This failure suggests that disclosure of additional names would have led to the same result, and that the ruling did not prejudice her.[12]

Doe cites *Puerto v. Superior Court*, 158 Cal.App.4th 1242, 70 Cal.Rptr.3d 701 (2008) and *Crab Addison, Inc. v. Superior Court*, 169 Cal.App.4th 958, 87 Cal.Rptr.3d 400 (2008), but those cases do not assist her. Both dealt with state court discovery procedures, and neither addressed the informational privacy interests of

---

[12] Doe states she received no responses to her efforts to contact detainees still in custody (*see* AOB, 71), but whether detainees chose to respond to Doe's contact efforts was outside of Appellees' control.

former detainees. Moreover, in *Puerto* the identities of the witnesses in question had already been disclosed to the requesting party. *Puerto, supra,* 158 Cal.App.4th at 1251.

## CONCLUSION

For the foregoing reasons, Appellees respectfully request that this Court affirm the judgment and award costs in their favor.

Respectfully submitted,

DATED: Nov. 29, 2023                    COLLINS + COLLINS LLP


By: _____
         DAVID C. MOORE

MICHAEL L. WRONIAK
REBECCA J. CHMURA
Attorneys for Defendants/Appellees
COUNTY OF ORANGE; DON
BARNES; WILLIAM BAKER; JOE
BALICKI; MARK STICHTER;
REYNA RIVERA; DEVONNA
FALCONER; KASSANDRA MAYER;
ELIA RODRIGUEZ; RACHEL
ADDINGTON

63

## CERTIFICATE OF COMPLIANCE

I certify that:

This answering brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Times New Roman 14-point font in Microsoft Word. I further certify that this brief contains 14,643 words, including footnotes and headings, but not including tables, certificates, signature block, and cover page, as measured by the word count function in Microsoft Word.

DATED:  Nov. 29, 2023                    COLLINS + COLLINS LLP


By: _____
       DAVID C. MOORE

       MICHAEL L. WRONIAK
       REBECCA J. CHMURA
       Attorneys for Defendants/Appellees
       COUNTY OF ORANGE; DON
       BARNES; WILLIAM BAKER; JOE
       BALICKI; MARK STICHTER;
       REYNA RIVERA; DEVONNA
       FALCONER; KASSANDRA MAYER;
       ELIA RODRIGUEZ; RACHEL
       ADDINGTON

## CERTIFICATE OF SERVICE

I hereby certify that on, November 29, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED: November 29, 2023

_____
NELLY VERDUGO